NO. 07-09-0348-CV

 

IN THE COURT OF APPEALS

 

FOR THE
SEVENTH DISTRICT OF TEXAS

 

AT
AMARILLO

 

PANEL A

 

 AUGUST 24, 2011



 

 



 

 

COVENANT HEALTH SYSTEM D/B/A COVENANT MEDICAL CENTER, APPELLANT

 

V.

 

DEAN FOODS COMPANY, A CERTIFIED SELF-INSURED, APPELLEE 



 

 



 

 FROM THE 72ND DISTRICT
COURT OF LUBBOCK COUNTY;

 

NO. 2005-532,532; HONORABLE RUBEN REYES, JUDGE



 

 



 

Before CAMPBELL AND HANCOCK
and PIRTLE, JJ.

 

 

MEMORANDUM OPINION

            Appellant, Covenant Health System d/b/a Covenant
Medical Center, appeals the trial court's order granting the plea to the
jurisdiction filed by Appellee, Dean Foods Company, in a suit filed by an
injured employee alleging bad faith and Insurance Code violations in connection
with the non-payment of workers' compensation benefits.   In a
single issue, Covenant asserts the trial court erred in dismissing its claims related
to the non-payment of medical expenses for lack of subject matter
jurisdiction.  We reverse and remand.

Background

            Covenant
intervened in an action filed by Daniel Jara, an employee of Dean Foods, to
recover its medical expenses incurred during Jara's treatment for a
work-related injury.  On June 2, 2000,
Jara injured his right knee while employed by Dean Foods and underwent knee
surgery.  The injury was compensable
under the Texas Workers Compensation Act (Act).[1]  In April 2004, Jara underwent a second knee
operation at Covenant to treat a staph infection that developed in his right
knee.  As a result, Jara incurred
approximately $600,000 in medical expenses.

            In
July 2004, Covenant submitted Jara's medical bills to Dean Foods for
payment.  Dean Foods's third party
administrator, Crawford & Company (Crawford), audited Covenant's bills for
compliance with the Act's medical fee guidelines and assessed deductions.  Of the $599,364.54 in medical expenses
submitted by Covenant, Crawford concluded $301,928.31 was payable.  In August 2004, Covenant requested that Dean
Foods reconsider its decision and, in September, Dean Foods affirmed its deductions
and denied Covenant any payment asserting Jara's second knee operation was not
compensable under the Act.  

            Jara
disputed Dean Foods's determination that his injury was non-compensable before
the Texas Workers’ Compensation Commission (TWCC) and a Contested- Case Hearing
was held to determine whether Jara's compensable injury in June 2000 extended
to his staph infection.  Covenant joined
as a subclaimant.[2]  In April 2005, the Contested-Case Hearing
Officer issued a Decision and Order wherein he determined "[Jara's]
compensable injury sustained on June 2, 2000 [did] not include [his] staph
infection."  Jara appealed the
Hearing Officer's Decision to the TWCC Appeals Panel who affirmed the Hearing
Officer's Decision.

            In
August 2005, Jara filed an action in Lubbock County District Court seeking
judicial review of the TWCC Appeals Panel's decision and asserted Dean Foods
breached its duties of good faith and fair dealing, and fair settlement
practices in violation of the Texas Insurance Code and Texas Deceptive Trade
Practices Act (judicial review suit). 
Covenant subsequently intervened seeking
payment of its medical bills and asserted claims against Dean Foods for bad
faith and Insurance Code violations.  In
July 2006, the trial court severed and abated all claims for bad faith and
Insurance Code violations, and assigned Cause Number 2005-532-049-A (bad faith
suit) to those claims.  In January 2007,
the trial court entered an order granting Dean Foods's Plea to the Jurisdiction in the judicial review suit and dismissed
Covenant for failure to exhaust its administrative remedies "without
prejudice to the refiling of same."

            In
July 2007, Jara's judicial review suit was tried before a jury who found in
Jara's favor and the trial court entered a final judgment that Jara's
compensable injury of June 2, 2000, included the staph infection.  Neither party appealed and
the trial court reinstated the bad faith suit. 
In April 2008, Covenant intervened in the bad faith suit again seeking
to recover its medical expenses.   In May 2009, Dean Foods moved to dismiss
Covenant from the bad faith suit for lack of subject matter jurisdiction,
asserting Covenant failed to exhaust its administrative remedies under the Act.  The trial court granted Dean Foods's Plea to the Jurisdiction.[3]  This appeal followed.

Discussion

            Covenant asserts the trial court
erred in dismissing its claims for lack of subject matter jurisdiction due to a
failure to exhaust its administrative remedies. 
In support, Covenant contends that it was not required to join Jara's
appeal of either the Hearing Officer's or the TWCC Appeals Panel's decisions
because it is a subclaimant and, as such, its claim is derivative of Jara's
claim.  Covenant also asserts that it was
not required to undergo medical dispute resolution because Covenant did not
dispute the reduced amount that Dean Foods determined was payable, i.e., $301,928.31.  Dean Foods, on the other hand, asserts that
Covenant was required to join in Jara's appeals to preserve its claim for
medical expenses and, because Dean Foods offered to pay less than the full
amount requested by Covenant for Jara's treatment, Covenant's claim was
required to undergo medical dispute resolution. 


            I.          Standard
of Review

            Subject
matter jurisdiction is essential to the authority of a court to decide a case.  Tex. Ass'n of Bus. v.
Texas Air Control Bd., 852 S.W.2d 440, 443 (Tex. 1993).  Whether a trial court has subject matter
jurisdiction is a question of law; Tex.
Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 226 (Tex. 2004),
that appellate courts review de novo.  Mayhew v. Town of Sunnyvale, 964 S.W.2d 922, 928 (Tex. 1998).  When conducting a de novo review, the appellate court exercises its own judgment and
redetermines each legal issue, giving no deference to the trial court's
decision.  Quick v. City of Austin, 7 S.W.3d 109, 116
(Tex. 1999) (op. on reh'g).  When
a plea to the jurisdiction challenges the pleadings, we determine if the
pleader has alleged facts that affirmatively demonstrate the court's
jurisdiction to hear the case.  Combined Specialty Ins. Co. v. Deese,
266 S.W.3d 653, 657 (Tex.App.--Dallas 2008, no pet.).  Where, as here, a plea to the jurisdiction
challenges the existence of jurisdictional facts, we consider the relevant
evidence submitted by the parties to determine if a fact issue exists.  Id.  The standard of review for a
jurisdictional plea based on evidence "generally mirrors that of a summary
judgment under Texas Rule of Civil Procedure 166a(c)."  Id. (quoting Tex. Dep't of
Parks & Wildlife, 133 S.W.3d at 228).  In reviewing a plea to the jurisdiction, an
appellate court does not look to the merits of the case but considers only the
pleadings and evidence relevant to the jurisdictional inquiry.  Tex.
Dep't of Parks & Wildlife, 133 S.W.3d at 227.

            II.         TWCC's
Exclusive Jurisdiction

            The
TWCC has exclusive jurisdiction to determine compensability; In re Tyler Asphalt & Gravel Co., Inc.,
107 S.W.3d 832, 839 (Tex.App.--Houston [14th Dist.] 2003, no pet.) (citing Henry v. Dillard Dep't Stores, Inc., 70
S.W.3d 808, 809 (Tex. 2002)), as well as disputes related to medical fees; Howell v. Tex. Workers' Comp. Comm'n,
143 S.W.3d 416, 435 (Tex.App.--Austin 2004, pet. denied) (citing Subaru of Am., Inc. v. David McDavid Nissan,
Inc., 84 S.W.3d 212, 221 (Tex. 2002) (op. on reh'g), prior to any judicial
review.[4]  A party's failure to exhaust their
administrative remedies provided under the Act deprives the trial court of
jurisdiction over a party's request for judicial review.  § 410.251; Cont'l Cas. Co. v. Rivera, 124 S.W.3d 705, 712 (Tex.App.--Austin 2003, pet.
denied).  

            When
compensability is disputed, judicial review is permitted only after the party
has exhausted administrative review through a contested-case hearing or
arbitration, followed by an appeal to a TWCC Appeals Panel.  §§
410.251; 410.302(b).  See Combined Specialty Ins. Co., 266 S.W.3d at 658.  If
there is a dispute between a health care provider and a compensation carrier
regarding a medical expense, the health care provider is entitled to review of
the medical service; § 413.031(a),[5]
and must exhaust administrative review through the TWCC's medical review division;
28 Tex. Admin. Code § 133.307 (2011),[6]
and a contested-case hearing before the State Office of Administrative Hearings
(SOAH); 28 Tex. Admin. Code § 133.307(f)(1), before seeking judicial
review of the decision in a Travis County District Court as governed by Chapter
2001 of the Government Code.  28 Tex. Admin. Code § 133.307(f)(2)(F)
(medical fee disputes); see Tex.
Gov't Code Ann. § 2001.176(b)(1) (West 2008) (requiring request for judicial
review to be filed in Travis County unless provided by statute). 

            A.        Compensability

            We agree with Covenant that its claim
for medical expenses was derivative of Jara's claim seeking compensability and,
as such, Covenant was not required to join Jara's appeal of the non-compensability
determinations made by the Hearing Officer and the TWCC Appeals Panel in order
to participate in the bad faith suit.

            As
a provider of medical services to Jara, or as a subclaimant, Covenant's claim
for payment is contingent on Jara's ability to receive workers' compensation
benefits under the statute, i.e, Covenant's claim is derivative
of Jara's claim.  See Tex. Mutual Ins. Co. v. Sonic Systems International, Inc., 214
S.W.3d 469, 483-84 (Tex.App.--Houston [14th Dist.] 2006, pet. denied) (op. on
reh'g).  As such, it is unnecessary for
Covenant to perfect an appeal of either the Hearing Officer's or the TWCC
Appeals Panel's decisions because its expenses are a part of Jara's overall workers'
compensation claim.  See Latham v. Security Ins. Co. of Hartford, 491 S.W.2d 100, 105-06
(Tex. 1972) (op. on reh'g) ("The person whose standing is derivative to
that of the employee would not be entitled to enforce the award, and he need
not be made a party in a suit to set aside the award."); City of Bridgeport v. Barnes, 591 S.W.2d
939, 942 (Tex.App.--Fort Worth 1979, writ ref'd n.r.e.) (medical
provider need not perfect an appeal of an adverse administrative ruling because
its expenses were part of the employee's claim).  In addition, although such medical expenses
are usually a part of the injured employee's claim, health care providers such
as Covenant have a direct cause of action against a compensation carrier under
the Act.  See Latham, 491 S.W.2d at 106 ("Medical expenses may be
recovered in a direct action by the physician and others, but these expenses
too are part of the injured employee's claim."); City of Bridgeport, 591 S.W.2d at 942.

            Dean
Foods contends that, because Covenant participated as a "subclaimant"
in the contested-case hearing, Covenant was required to appeal the Hearing
Officer's non-compensability determination to the TWCC Appeals Panel to
preserve any claim based on Jara's medical expenses.  Covenant's appearance in the contested-case hearing
was gratuitous[7]
because section 409.009 indicates that a person qualifying as a subclaimant may participate by filing a written
claim.  § 409.009.  Regardless whether Covenant filed a claim as
a "subclaimant," its claim for reimbursement remained contingent upon
Jara's ability to receive benefits under the statute; Sonic Systems International, Inc., 214 S.W.3d at 477, and Covenant's
gratuitous participation did not give the Hearing Officer any power to
adjudicate Covenant's claim for reimbursement of its medical expenses.  Hooks,
Inc. v. Pena, 313 F.2d 696, 702 (5th Cir. 1963) (interpreting Texas's
Workmen's Compensation Act); see Latham,
491 S.W.2d at 106 ("The inclusion of other names in the [TWCC's] award
usually does no more than provide a detail of payment by the insurer for the
benefit of the principal compensation claimant.")  In addition, there is a separate and distinct
administrative process to handle claims for medical expenses such as Covenant's
and, other than referring to Covenant as a "subclaimant," the Hearing
Officer's Decision and Order makes no mention of any claim for medical
expenses.[8]  

            That
Covenant does not qualify under the Act to appeal the TWCC Appeals Panel's
decision supports this determination. 
The Act permits an appeal from an appeals panel decision in the form of
judicial review if a party has exhausted its administrative remedies and
"is aggrieved by a final decision." 
§ 410.251.  "[A] party is
aggrieved by a final decision of the [TWCC] appeals panel if the injury or loss
resulting from the final decision is actual and immediate; a possible future
injury or loss as a consequence of the panel decision is not sufficient to show
an aggrievement."  Insurance Co. of the State of
Pa. v. Orosco, 170 S.W.3d 129, 133 (Tex.App.--San Antonio 2005, no pet.).  When an appeals panel decision finds the
employee's claim is non-compensable, as here, there is no immediate or actual
loss to the health care provider because the adverse decision of compensability
by the appeals panel merely indicates that the employee's injury is not covered
by the Act, i.e., the health care provider never had the legal right to
reimbursement from the compensation carrier under the Act.  His legal right to recover payment in full from
the employee, however, remains viable.  See § 413.042(a)(1)
("A health care provider may not pursue a private claim against a workers'
compensation claimant . . . unless: (1) the injury is finally adjudicated not
compensable under this subtitle.")  See also Smith v. Stephenson, 641 S.W.2d 900, 902 (Tex. 1982) ("We do
agree the employee maintains a contractual obligation to the provider . . .
[and] may even become liable for all medical expenses if the injury is found to
be non-compensable.").   

            Accordingly,
we find the trial court did not lack subject matter jurisdiction over
Covenant's intervention in Jara's bad faith suit due to any failure by Covenant
to exhaust any administrative remedies in Jara's contested-case appeal to the
Appeals Panel or his subsequent judicial review suit. 

            

            B.        
Medical Expenses

             
 Covenant asserts that it was not
required to undergo a Chapter 413 medical dispute resolution because it did not
dispute the amount that Crawford determined was payable, i.e., $301,928.31.  Dean Foods, on the other hand, asserts Covenant
was required to request medical dispute resolution to preserve its claim for
medical expenses because Dean Foods offered to pay less than the full amount
requested by Covenant. 

            An
employee "who sustains a compensable injury is entitled to all health care
reasonably required by the nature of the injury as and when needed."  § 408.021(a).[9]  "A party, including a health care
provider, is entitled to review of a
medical service provided for which authorization of payment is sought if a
health care provider is:  denied payment
or paid a reduced amount for the medical service rendered . . . ."  § 413.031(a)(1).  "A request for medical dispute
resolution of a medical fee dispute must be timely filed with the TWCC's
Medical Review Division."  28 Tex. Admin. Code § 133.307(c).[10]  Otherwise, a person or entity that fails to
timely file a request for review waives their right to dispute resolution.  Id.  It is undisputed that Covenant did not
file for medical dispute resolution regarding Dean Foods’s reduction of its
medical bills submitted in July of 2004. 


            We
agree with Covenant that the trial court erred in finding there was no subject
matter jurisdiction over Covenant's claim for payment of its medical bills in
the amount of $301,928.31.  Although
Covenant submitted medical bills totaling $599,364.54, Dean Foods audited
Covenant's bills for compliance with the Act's medical payment guidelines and
assessed reductions of $297,436.23. 
Because Covenant did not dispute these reductions in a timely manner,
any recovery of this amount by Covenant was waived per regulation.  However, given that the trial court issued a
final judgment finding Jara's injury compensable, the amount determined by Dean
Foods to be payable, $301,928.31, remains owing to Covenant.

            Dean
Foods contends that, whenever a compensation carrier reduces a health care
provider's bill, whether or not the health care provider agrees with the
reduction, the health care provider must request medical dispute
resolution.  We disagree.  The Act's language regarding a health care
provider's participation in medical dispute resolution is not mandatory, but
permissive, i.e., where a compensation carrier denies payment or pays a reduced
amount for the medical services rendered, "a health care provider, is entitled to review of a medical
service . . . ."  § 413.031(a)(1) (emphasis added). 
When the health care provider agrees to the compensation carrier's reductions
or waives review through inaction, the health care provider can bring a direct action
against the compensation carrier for the balance due for medical expenses
incurred in the treatment of a compensable injury.  See
Latham, 491 S.W.2d at 109; City of Bridgeport, 591 S.W.2d at 942.  

            Moreover,
under the applicable regulations, once the health care provider who has made a
request informs the Medical Review Division (MRD), or the MRD otherwise
determines, the dispute no longer exists, the MRD can dismiss the health care
provider's request for medical fee dispute resolution.  28 Tex. Admin. Code
§ 133.307(e)(3)(A). 
This language clearly indicates that a "dispute" is necessary
before a request need be filed or reviewed by the MRD.[11]  Here, Covenant either agreed with, or waived
review of, Dean Foods's reductions.  Accordingly,
we find the trial court erred in its finding that it lacked subject matter
jurisdiction over Covenant's claims asserted in the bad faith suit.  Appellant's single issue is sustained.

Conclusion

            We
reverse the judgment of the trial court and remand for further proceedings
consistent with this opinion.

                                                                                                

Patrick
A. Pirtle

      Justice











[1]See Texas Lab. Code Ann. §§
401.001-506.002 (West 2006 and West Supp. 2010).  For convenience, provisions of the Texas
Labor Code will be cited throughout the remainder of this opinion as
"section ____" and "§ ____."





[2]The
Act states as follows:

A person
may file a written claim with the division as a subclaimant if the person has:

(1) provided compensation,
including health care provided by a health care insurer, directly or indirectly,
to or for an employee or legal beneficiary; and

(2) sought and been refused reimbursement from the insurance
carrier.

§ 409.009.

 





[3]Dean Foods's Traditional and No Evidence
Motion for Summary Judgment and Plea to the Jurisdiction Against Intervenor Covenant
Health System d/b/a Covenant Medical Center also asserted that Covenant
lacked standing because there was no contractual or special relationship
between Covenant and Dean Foods that would impose a duty of good faith and fair
dealing on Dean Foods.  Because the trial
court's order granted only Dean
Foods's Plea to the Jurisdiction and
dismissed Covenant for lack of subject matter jurisdiction, we decline Dean
Foods's invitation to address whether it owed any duty of good faith and fair
dealing to Covenant in this appeal in the context of a challenge to Covenant's
standing.





[4]When
a carrier denies liability for payment of medical benefits on the basis that
the injury is not compensable ("compensability disputes"), the
general dispute resolution procedures of Chapter 410 of the Texas Labor Code
apply. § 410.023. Disputes concerning the denial of payment or the payment of a
reduced amount based on the medical necessity of treatment or the
reasonableness of the fees are "medical disputes" governed by the dispute
resolution procedures of Chapter 413. § 413.031; Continental Cas. Ins. Co. v.
Functional Restoration Associates, 19 S.W.3d
393, 396 & n.2 (Tex. 2000).

 





[5]Generally
speaking, there are two types of "review of a medical service" that
can be conducted under section 413.031(a). 
The first is a review of the "medical necessity" of a health
care service, which is currently performed by an independent review
organization (IRO).  See § 413.031(d)-(e-3), (g)-(i). 
The other type of review concerns "disputes over the amount of
payment due for services determined to be medically necessary and appropriate
for treatment of a compensable injury," commonly termed "medical fee
disputes."  § 413.031(c).  In resolving medical fee disputes, "the
role of the division is to adjudicate the payment given the relevant statutory
provisions and commissioner rules." 
Id.  





[6]We
cite to the current administrative code provisions having found no material
variance between the relevant provisions of the current code and the code as it
existed during the relevant time period.   






[7]Dean
Foods contends Covenant was a "party" to the proceedings, not a
"subclaimant."  However, the
Hearing Officer's Decision indicates Covenant was participating as a
"subclaimant."  "Claimant
appeared and was represented . . . Subclaimant, Covenant Medical Center, was
represented."





[8]Under
Chapter 410, claims are first decided by a Hearing Officer, then appealed to
the TWCC Appeals Panel and finally heard before a district court.  § 410.302(b). 
See Combined Specialty Ins. Co.,
266 S.W.3d at 658. 
In a Chapter 413 proceeding, the fee bill dispute is first considered by
the medical review division; 28 Tex. Admin. Code § 133.307, then decided by
SOAH in a contested-case hearing; 28 Tex. Admin. Code 133.307(f)(1), before being finally heard by a district court in
Travis County. § 413.031(k)-(l).  Here,
the Hearing Officer's Decision and Order indicates Jara's case was decided
under " [Chapter 410 of] the Texas Workers' Compensation Act . . . and
[the applicable regulations]."     





[9]Regarding
payment of medical bills and related disputes, the Act speaks in mandatory
terms when an employee's claim is compensable. 
Howell v. Tex.
Workers Comp. Comm'n, 143 S.W.3d 416, 436-37 (Tex.App.--Austin 2004, pet.
denied).  See §§ 408.027(a), 408.027(b), 408.027(b), (1 & (2),
408.027(b). 





[10]"Medical
fee disputes involve disputes over the amount of payment for . . . health care
rendered to an injured employee (employee) that has been determined to be
medically necessary and appropriate for treatment of that employee's compensable
injury."  28 Tex.
Admin. Code § 133.305(a)(2).  A "medical fee dispute" does not
include disputes pertaining to compensability. 
See 28 Tex. Admin. Code §
133.307(e)(3)(H) ("[If] the carrier has raised a
dispute pertaining to compensability . . . , the Division shall notify the
parties of the review requirements pursuant to § 124.2 of this title, and will
dismiss the request until those disputes have been resolved by a final
decision, inclusive of appeals.")  





[11]A
"dispute" requires two parties who disagree, oppose or call into
question the payable amount of the medical fee owed to one who provided medical
services for an injured employee.  See Merriam-Webster's Collegiate
Dictionary 362 (11th Ed. 2003).  Once the
medical provider has waived his dispute by failing to timely file a claim or
agrees with the compensation carrier's audit of his medical bills, there is no
dispute.  








>

 




 

QUESTION 3

 

What sum of money would have fairly compensated Jacob Perea for --

 

a.   Pain and mental anguish . . . means
the conscious physical pain and emotional pain . . . experienced by Jacob Perea
before his death as a result of the occurrence in question. . . .

 

STATE BAR OF TEX.,
TEXAS PATTERN JURY CHARGES--SURVIVAL DAMAGES, PJC 10.2 (2008).

 

QUESTIONS 4-7

 

What sum of money, if paid now in cash, would fairly and reasonably
compensate [Mario, Max, Tony, George] for [their] damages, if any, resulting
from the death of Jacob Perea?

 

STATE BAR OF TEX.,
TEXAS PATTERN JURY CHARGES--WRONGFUL DEATH DAMAGES, PJC 9.3 (2008).

 

            THI
sought to replace Question 1 with the following language: "[d]id the
negligence, if any, of the ones named below proximately cause the death of Jacob Perea?"  (Emphasis added).  Appellant also made the following objection,
in pertinent part to the charge:

[T]he question should be a question about whether the negligence of
either of the two Defendant parties proximately caused the death of Mr. Perea.
. . . And I say this because only in the event that the negligence of the
Defendants caused the death of Mr. Perea are wrongful death beneficiaries
entitled to recover.  If the jury were to
believe that some act or omission by the employees of Southwest  . . . . or Pharmasource . . . caused an
injury to Mr. Perea, but not his death, then the wrongful death beneficiaries
would not be entitled to recover. . . .  The only evidence of injury in this case is
death.  So the Court's Charge should
reflect that, and the jury's answer should also reflect that they are actually
answering the question that would permit recovery of wrongful death
beneficiaries. 

 

[Emphasis added].

 

            




 

VI.       Judgment

            Thereafter, the jury found THI and Pharmasource proximately caused the
injury in question[31] and awarded Jacob's estate
$159,718.40 in damages for pain and mental anguish, medical expenses, and
funeral and burial expenses.[32]  Jacob's sons were each awarded $100,000 for
past loss of companionship and society, future loss of companionship and
society, past mental anguish and future mental anguish for a total of
$400,000.  The jury also found that
Southwest was grossly negligent and awarded exemplary damages of $1,250,000.  Based upon these jury findings, the trial
court entered a judgment decreeing that Appellees recover from THI the sum of
$1,696,895.50.[33]

            In
its judgment, the trial court apportioned Appellees recovery as follows:

Mario Perea, as representative of Jacob's estate           $307,760.22

Mario Perea, individually                                                    $347,283.82

Max Perea                                                                             $347,283.82

Tony Perea                                                                           $347,283.82

George Perea                                                                       $347,283.82

 

Total Judgment --- Southwest Regional

Specialty Hospital                                                            $1,696,895.50

 

            Thereafter,
THI filed a motion for judgment notwithstanding the verdict, remittitur, and to
modify, correct, or reform the judgment. 
The trial court denied THI's motion and its motion for
reconsideration.  This appeal followed. 

Discussion

            THI asserts: (1) the trial court abused its discretion by using a
broad-form jury instruction on negligence and proximate cause when Appellees
sought survival and wrongful death damages; (2) the trial court abused its
discretion by granting Appellees a trial amendment to assert an action for
negligent credentialing/hiring because the amendment was prejudicial to the
presentation of THI's defense; (3) Appellees' evidence was legally and
factually insufficient to support a judgment on their claims of negligent
credentialing/hiring and factually insufficient to support Appellees' claim of negligence,
i.e., that THI's conduct proximately caused Jacob's death or the nurses at Southwest
Hospital were negligent in the performance of their duties; (4) Appellees' evidence
that THI was grossly negligent is legally and (5) factually insufficient; (6)
the trial court abused its discretion by excluding evidence of the fact that THI
had conducted an investigation related to Jacob's death; and (7) the trial
court abused its discretion as a matter of law by failing to apply statutory
damage caps in sections 41.008(b) and 74.301(b) of the Texas Civil Practice and
Remedies Code. 

            I.          Jury Instruction

                        A.        Standard of Review

            We review a trial
court's decision to submit or refuse a particular jury instruction under an
abuse of discretion standard.  Shupe v. Lingafelter, 192 S.W.3d 577,
579 (Tex. 2006).  See In the Interest of V.L.K., 24 S.W.3d 338, 341 (Tex. 2000).  Although
a trial court has great latitude and considerable discretion to determine
necessary and proper jury instructions; see
Tex. R. Civ. P. 277; H.E. Butt Grocery
Company v. Bilotto, 985 S.W.2d 22, 23 (Tex. 1998), the trial court abuses
its discretion if "the court acts arbitrarily, unreasonably or without
reference to guiding principles of law." 
McWilliams v. Masterson, 112
S.W.3d 314, 317 (Tex.App.--Amarillo 2003, pet. denied).  

            When a trial court refuses to submit
a requested instruction on an issue raised by the pleadings and evidence, the
question on appeal is whether the request was reasonably necessary to enable
the jury to render a proper verdict.  Shupe, 192 S.W.3d at 579 (citing Tex. Workers Comp. Ins. Fund v. Mandlbauer,
34 S.W.3d 909, 912 (Tex. 2000)).  Further,
omission of an instruction is harmful, or reversible error, only if the
omission probably caused the rendition of an improper judgment; Tex. R. App. P.
44.1(a), 61.1(a); see Wal-Mart Stores,
Inc. v. Johnson, 106 S.W.3d 718, 723 (Tex. 2003); and is harmless
"when the findings of the jury in answer to other issues are sufficient to
support the judgment."  Boatland of Houston, Inc. v. Bailey, 609
S.W.2d 743, 750 (Tex. 1980).  See City of Brownsville v. Alvarado, 897
S.W.2d 750, 752 (Tex. 1995) (a jury question may be immaterial, or harmless, "when
its answer can be found elsewhere in the verdict or when its answer cannot
alter the effect of the verdict"). Whether harm exists is viewed in the
context of the whole charge.  Boatland, 609 S.W.2d at 749-50. 

                        B.  Wrongful Death and Survival Actions

            The
Texas Survival Statute permits a decedent's heirs, legal representatives, and
estates to bring actions for personal injuries the decedent suffered before his
death; see Tex. Civ. Prac. & Rem.
Code Ann. § 71.021 (Vernon 2008), while the Texas Wrongful Death Act confers a
cause of action upon the surviving spouse, children, and parents of a decedent
for their damages resulting from the decedent's death.  See
Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, 71.004 (Vernon 2008).  

            To
establish a cause of action under either statute, the claimant must establish a
death and the occurrence of a wrongful act. 
Mayer v. Willowbrook Plaza Ltd.
Partnership, 278 S.W.3d 901, 909 (Tex.App.--Houston [14th Dist.] 2009, no
pet.).  If negligence is alleged as the
wrongful act, the claimant must show that the defendant's negligent act or
omission was a substantial factor in bringing about the decedent's death, and
without it, the decedent's death would not have occurred.  See
Columbia Medical Ctr. of Las Colinas, Inc. v. Hogue, 271 S.W.3d 238, 246
(Tex. 2008) (citing IHS Cedars Treatment
Ctr., Inc. v. Mason, 143 S.W.3d 794, 798 (Tex. 2004)).  

            The
difference between the two statutes is the nature of the damages that may be
recovered and who may collect them.  The
purpose of the Texas Survival Statute is "to continue a decedent's cause
of action beyond death to redress decedent's estate for decedent's injuries
that occurred before he died."  Borth v. Charley's Concrete
Co., 139 S.W.3d 391, 395 (Tex.App.--Fort Worth
2004, pet. denied).  See Tex. Civ. Prac. & Rem. Code Ann.
§ 71.021 (Vernon 2008).  On the other
hand, the purpose of the Wrongful Death Act is to permit a surviving husband,
wife, child, and parents of the decedent to bring a cause of action to redress
their injuries resulting from the decedent's death.  See
Tex. Civ. Prac. & Rem. Code Ann. §§ 71.002, 71.004, 71.010 (Vernon 2008).         

            Here,
the gist of Appellees' action is that Southwest Hospital's nurses wrongfully administered
two doses of Ativan to Jacob proximately causing his death.  Jacob's estate sought to recover Jacob's
damages for injuries he suffered prior to his death[34] and Jacob's sons sought to
recover damages they suffered because of his death.[35]  Thus, in order to recover, Appellees were required
to prove THI breached a duty owed to Jacob and the breach proximately caused
the damages sought by Jacob's estate and sons. 
Hogue, 271 S.W.3d at 246.[36]  

            To
determine whether Southwest Hospital was negligent, the trial court chose to charge
the jury with the Texas Pattern Jury Charge or Broad Form Charge for Joint Submission
of Negligence and Proximate Cause.  See STATE BAR OF TEX., TEXAS PATTERN
JURY CHARGES--GENERAL NEGLIGENCE; INTENTIONAL PERSONAL TORTS, PJC 4.1
(2008).  Although the Texas Pattern Jury
Charges are not "law," they are heavily relied upon by bench and bar
and based on what the State Bar Committee perceives the present law to be.  H. E.
Butt Co. v. Bilotto, 928 S.W.2d 197, 199 (Tex.App.--San Antonio 1996), aff'd, 985 S.W.2d 22 (Tex. 1998).  See
Borden, Inc. v. Price, 939 S.W.2d 247, 254 (Tex.App.--Amarillo 1997, writ
denied).[37]  

            The
trial court's charge instructed the jury that, absent a proper legal definition
for a term, the jury should attribute the "meaning commonly
understood" to the words in the charge. 
Given the facts of this case and the similarity in the meanings of the terms
"injury" and "death," as a precipitant to damages, we
cannot say that, as a matter of law, a reasonable juror would have been
misguided by the trial court's instruction. 
This is particularly so when the vast majority of the evidence at trial,
both testimonial and documentary, was related to Jacob's manner of death and
whether the Ativan dosage caused his death. 
In fact, during the trial court's hearing on the jury instructions,
THI's counsel affirmatively stated that "[t]he only evidence of injury is
death."  

            Further,
while a Comment to PJC 4.1 addressing use of the terms "occurrence"
or "injury" suggests that "[i]n a case involving death, the word
'death' may be used instead of
'injury'"; (emphasis added), this Comment addresses circumstances where
there may be evidence of a plaintiff's negligence that is
"injury-causing" or "injury-enhancing" but not
"occurrence-causing."  This
Comment is inapplicable insofar as THI points to no evidence of record
establishing that any negligence by Jacob, or by any other third party, may
have either caused or enhanced his injury or death.  Furthermore, THI did not request an issue attributing
any negligence to Jacob.

            Neither
did the trial court abuse its discretion by failing to issue two instructions, i.e., one using the word "injury"
and one using the word "death." 
While trial courts should obtain fact findings on all theories pleaded
and supported by the evidence, a trial court is not required to, and should
not, confuse the jury by submitting differently worded questions that call for
the same factual finding.  See Star Enterprise v. Marze, 61 S.W.3d
449, 459 (Tex.App.--San Antonio 2001, pet. denied).  Questions are duplicitous if they embrace the
same fact question, whether identical in language or merely similar in
form.  Miller v. Wal-Mart Stores, 918 S.W.2d 658, 664 (Tex.App.--Amarillo
1996, writ denied) (citing Holmes v. J.C.
Penney Company, 382 S.W.2d 472, 473 (Tex. 1964)).  Here, either "injury" or
"death" would have been appropriate terms for the negligence
instruction.  Given the trial court's
broad discretion in submitting jury questions, we cannot say the trial court
abused its discretion by choosing the term "injury" over "death."  

            Finally,
even if use of the term "injury" rather than "death" were
error, the answers sought by Southwest Hospital can be found in Questions 3(c)
and 4 through 7.  While Question 1 sought
to establish whether THI's conduct negligently caused Jacob's injury, Questions
3(c), and 4 through 7, sought to establish damages resulting from his death.[38]  Moreover, THI fails to offer any evidence
establishing that use of the term "injury" rather than
"death" caused rendition of an improper judgment.  Accordingly, THI's first issue is overruled.

            II.         Trial Amendment

            During their case-in-chief, Appellees
confronted Espinoza with the Colorado Board of Nursing's stipulated order and
examined him without objection.[39]  Thereafter, when Appellees sought to amend their
petition to assert a negligent credentialing/hiring claim against THI, THI
objected that (1) Appellees were pleading a cause of
action for which there was no recovery because there were no damages; (2) the
evidence was irrelevant because Espinoza worked as a Licensed Practical or
Vocational Nurse in Colorado, not as a Registered Nurse; and (3) evidence of
Espinoza's disciplinary proceeding six years earlier was irrelevant.  THI did not seek a continuance.

            Under
Rule 66 of the Texas Rules of Civil Procedure, a trial court may not refuse a
trial amendment unless (1) the opposing party presents evidence of surprise or
prejudice, or (2) the amendment asserts a new cause of action or defense and thus
is prejudicial on its face and the opposing party objects to the amendment.  Hart v.
Moore, 952 S.W.2d 90, 95 (Tex.App.--Amarillo 1997, writ denied) (citing Greenhalgh v. Service Lloyds Insurance Co.,
787 S.W.2d 938, 939 (Tex. 1990)).  See The State Bar v. Kilpatrick, 874
S.W.2d 656, 658 (Tex.) (per curiam)
(decision to permit or deny trial amendment rests in sound discretion of trial
judge if amendment asserts new cause of action or defense and thus prejudicial
on its face), cert. denied, 512 U.S.
1236, 114 S.Ct. 2740, 129 L.Ed.2d 860 (1994).[40]  The opponent of the trial amendment has the
burden of showing surprise or prejudice, and "[a] motion for continuance
based upon the ground of surprise or prejudice is essential before the filing
of a trial amendment will constitute reversible error."  Resolution
Trust Corp. v. Cook, 840 S.W.2d 42, 46 (Tex.App.--Amarillo 1992, writ
denied).  See Jones v. Blackmon, 419 S.W.2d 434, 440 (Tex.Civ.App.--Houston
[14th Dist.] 1967, writ ref'd n.r.e.) (trial court does not ordinarily abuse
its discretion when party opposing an amendment does not ask for a
postponement).

            Appellees' trial amendment was made
during their case-in-chief.  THI had yet
to put on its defense.  THI did not
object to the amendment because of surprise or prejudice, nor did it seek a continuance.  Rather, THI asserted that the proposed action
was legally deficient and/or the underlying evidence in support of the action
was irrelevant.  Having failed to object
to the amendment based upon surprise or prejudice, THI may not now assert these
grounds on appeal.[41]

            To preserve error on appeal, a party
must make a timely, specific objection or motion to the trial court that states
the grounds for the ruling sought with sufficient specificity and complies with
the rules of evidence and procedure.  See
Tex. R. App. P. 33.1(a).  Because THI
presents this argument for the first time on appeal, it is waived.  Id.  See Marine Transp. Corp. v. Methodist Hosp., 221 S.W.3d 138, 147 n.3 (Tex.App.–Houston
[1st Dist.] 2006, no pet.). 
THI's second issue is overruled.

            III.        Recovery Under
Appellees' Negligence Theories

 

            THI
asserts Appellees’ evidence at trial in support of their
negligent credentialing/hiring claim is both legally and factually insufficient,
i.e., Appellee failed to establish
Southwest Hospital's conduct breached any standard of care in hiring Espinoza
or that any negligence in hiring Espinoza caused Jacob's death.  THI also asserts Appellees' evidence at trial
in support of their negligence claim against Southwest Hospital is factually
insufficient, i.e., Appellees' expert evidence that Southwest Hospital's
negligence caused Jacob's death, when compared to THI's expert evidence, is so
weak that it is clearly wrong and manifestly unjust.  

                        A.  Standard of Review

            In conducting a legal sufficiency review,[42] we must consider the
evidence in the light most favorable to the challenged finding, indulge every
reasonable inference to support it; City
of Keller v. Wilson, 168 S.W.3d 802, 822 (Tex. 2005),[43] and credit favorable
evidence if reasonable jurors could and disregard contrary evidence unless
reasonable jurors could not.  Id. at 827.  A challenge to legal sufficiency will be
sustained when, among other things, the evidence offered to establish a vital
fact does not exceed a scintilla.[44]  Kroger Tex. Ltd. P'ship v. Suberu, 216 S.W.3d 788, 793 (Tex. 2006).  Furthermore, so long as the evidence falls
within the zone of reasonable disagreement, we may not invade the factfinding
role of the jurors, who alone determine the credibility of witnesses, the
weight to be given their testimony, and whether to accept or reject all or part
of their testimony.  Wilson, 168 S.W.3d at 822.

            In
reviewing a factual sufficiency challenge, we consider all the evidence and set
aside a finding only if it is so against the great weight and preponderance of
the evidence as to be clearly wrong and unjust. 
Ortiz v. Jones, 917 S.W.2d
770, 772 (Tex. 1996).  If, as here, the
appellant is challenging the factual sufficiency of the evidence to support a
finding on an issue on which the other party had the burden of proof, we must
overrule the complaint unless, considering all the evidence, the finding is
clearly wrong and manifestly unjust.  See Santa
Fe Petroleum, L.L.C. v. Star Canyon Corp., 156 S.W.3d 630, 637
(Tex.App.--Tyler 2004, no pet.) (citing Garza
v. Alviar, 395 S.W.2d 821, 823 (Tex. 1965)).  Inferences may support a judgment only if
they are reasonable in light of all the evidence; id., and, again, the trier of fact is the sole judge of the
credibility of the witnesses and the weight to be given their testimony.  GTE
Mobilnet of S. Tex. Ltd. P'ship v. Pascouet, 61 S.W.3d 599, 615-16
(Tex.App.--Houston [14th Dist.] 2001, pet. denied).  In addition, the mere fact that we might have
reached a different conclusion on the facts does not authorize us to substitute
our judgment for that of the jury.  Maritime Overseas Corp. v. Ellis, 971
S.W.2d 402, 407 (Tex. 1998). See Richmond
Condominiums v. Skipworth Commercial Plumbing, Inc., 245 S.W.3d 646, 658
(Tex.App.--Fort Worth 2008, no pet.).  

            




 

                        B.        Analysis

                                    1.         Negligent Credentialing/Hiring

            Here, although Appellees' claim is that Southwest Hospital was negligent
in credentialing or hiring Espinoza, the thrust of the claim is that the health
care facility failed to protect its patient--a claim that "necessarily
implicate[s] the acceptable standards of safety pursuant to the definition of
health care liability claim."[45]  Diversicare
Gen. Partner, Inc. v. Rubio, 185 S.W.3d 842, 855 (Tex. 2005).[46]  

            Negligent
hiring claims are both health care liability claims, see In Re McAllen Medical Center Inc., 275 S.W.3d 458, 462 (Tex.
2008), and "simple negligence causes of action."  Morris
v. JTM Materials, Inc., 78 S.W.3d 28, 49 (Tex.App.--Fort Worth 2002, no
pet.).  To establish a claim for
negligent hiring, supervision and retention, a plaintiff must prove the
following elements:  (1) a duty to hire,
supervise, and retain competent employees; (2) an employer's breach of the duty;
and (3) the employer's breach of the duty proximately caused the damages sued
for.  See
LaBella v. Charlie Thomas, Inc., 942 S.W.2d 127, 137 (Tex.App.--Amarillo
1997, writ denied).  

            An
employer is liable for negligent hiring, supervision, or retention when proof
is presented that the employer hired an incompetent or unfit employee whom it
knew or, by the exercise of reasonable care, should have known was incompetent
or unfit, thereby creating an unreasonable risk of harm to others.  See
Dangerfield v. Ormsby, 264 S.W.3d 904, 912 (Tex.App.--Fort Worth 2008, no
pet.).  Because Appellees' claim of
negligent credentialing and hiring is cognizable under chapter 74 of the Texas
Civil Practice and Remedies Code; Garland
Community Hosp. v. Rose, 156 S.W.3d 541, 544, 545-46 (Tex. 2003), expert
testimony is necessary to establish the elements of the claim.  Holguin,
256 S.W.3d at 356. 

            THI
asserts Appellees failed to produce more than a
scintilla of probative evidence that THI breached its standard of care by hiring
Espinoza and, if so, any breach by THI proximately caused Jacob's injuries.[47]  Appellees' expert, Dr. Haines, testified on
direct examination, without objection, that a director of nurses and hospital
administrators should have some involvement in assuring that nurses on their
staff will not write orders without a doctor's permission.  He testified that, when hiring nurses,
nursing directors, and administrators they should look at a nurse's past
employment record and determine whether they had problems or troubles at prior
nursing facilities.  He further opined that
nursing directors and hospital administrators had a duty to research the background
of people they hired.[48]  

            Dr.
Haines also testified that, if a nurse went "rogue" and administered
prescription drugs without the authority to do so, the nurse should lose their
license.  Nurse Jahomo testified that, if
she wrote an order for a patient's medication without a doctor's permission,
she would be in violation of her nursing license.  She also testified that, administering
medication without the proper approval would be extremely dangerous for the
patient and could cause the patient's death if there were an adverse effect.  Nurse Graham testified that, in December
2004, Espinoza had a reputation for being a "rogue" nurse and agreed
with Nurse Jahomo that a nurse who administered prescription drugs without
proper authority should lose their license. 
  

            Espinoza
testified that, prior to being employed at Southwest Hospital, he had been
disciplined by the Colorado Board of Nursing for administering Ativan to a
patient without a physician's prior approval. 
The Colorado Board of Nursing placed Espinoza on probation with specific
tasks to be completed prior to reinstatement of his nursing license.  He testified he relocated to Texas,[49]  began practicing as a nurse, and failed to
comply with any conditions of his Colorado
probation.

            Espinoza
further testified that in 1997 he was hired at Highland Medical Center where
his supervising nurse was Connie Long.  He
testified that he spoke to Long about his probation in Colorado and she hired
him despite knowing that he had his license suspended in Colorado for
administering Ativan without a doctor's approval.[50]  After Long moved to
Southwest Hospital to take a position as Director of Nursing, she recruited
Espinoza to join her and, in 2002, Espinoza began working at Southwest
Hospital.  Espinoza testified that,
although Long was by then aware of his stipulated probation order with the
Colorado Board of Nursing, she had no problem putting him on the floor and
permitting him to dispense medications to patients.  While he was employed at Southwest Hospital, he
testified his evaluations were always above average.  

            Although
Espinoza testified he wrote the order to administer Ativan to Jacob after
receiving approval from Nurse Graham by telephone, the jury could reasonably
infer from Dr. Rice's and Nurse Graham's testimony that Espinoza wrote the
order himself without prior approval.  Nurse
Graham testified that she did not receive any calls from Espinoza that day and
had no doubt that she did not approve the order to administer Ativan to Jacob.  

            Although
the testimony regarding who approved the administration of Ativan to Jacob was
conflicting, the jury's verdict indicates they credited and gave weight to
Nurse Graham's testimony.  See Wilson, 168 S.W.3d at 819
("Jurors are the sole judges of the credibility of witnesses and the
weight to give their testimony.  They may
choose to believe one witness and disbelieve another" and
"[r]eviewing courts cannot impose their own opinions to the
contrary."). See also Texas Drydock,
Inc. v. Davis, 4 S.W.3d 919, 924 (Tex.App.--Beaumont 1999, no pet.).  Moreover, "[c]ontroverted trial issues
are properly within the province of the jury if reasonable minds could differ
as to the truth of the controlling facts." 
Collora v. Navarro, 574 S.W.2d
65, 68 (Tex. 1978).  

            Given
this evidence, we conclude there was more than a scintilla of evidence establishing
that THI breached its duty to hire nurses that were competent or fit for
employment.  The jury could reasonably
infer from the evidence that THI, through Long, hired Espinoza knowing he was
on probation due to disciplinary proceedings in another state, for conduct that
reasonably endangered the health and safety of patients entrusted to his
care.  The evidence also reflects Long
did so without taking any precautions to assure that Espinoza would not commit
the same violations again.  Further, Espinoza
was permitted to medicate patients and then ultimately was placed in a managing
position with responsibilities that included supervising authority over nurses,
advising physicians or their assistants on medications, writing telephone
orders for the administration of drugs to patients, and instructing nurses on
which drugs to administer.  

            THI
points to Dr. Rice's answer to a hypothetical question as evidence that Southwest
Hospital was not negligent in hiring Espinoza. 
Dr. Rice testified he would not consider a previously disciplined nurse
unfit if that nurse had complied with the rehabilitative conditions established
by the board of nursing and had worked for six years at two different hospitals
without further incident.  Notwithstanding
this statement, the jury was free to conclude that Espinoza never complied with
the rehabilitative conditions of the Colorado order.    

            THI
also asserts that the passage of six years time between the act that caused the
Colorado Board of Nursing to place Espinoza on probation and Jacob's injury rendered
the Colorado Board of Nursing Order irrelevant. 
This assertion overlooks the principle that, "[w]hen a plaintiff's
credentialing [or hiring] complaint centers on the quality of the [patient's]
treatment . . . the hospital's acts or omissions in credentialing [or hiring]
are inextricably intertwined with the patient's medical treatment and the
hospital's provision of health care."  Rose,
156 S.W.3d at 546.  The Rose court stated, in pertinent part, as
follows:

Rose's is a case in point.  She
complains of acts and omissions that occurred, in significant part, during her
treatment.  Rose alleges that the
Hospital acted negligently and maliciously in allowing Dr. Fowler to perform
Rose's surgeries. . . . These decisions necessarily occurred during Rose's
treatment.  It is not necessary, however,
to dissect Rose's claims in to pre-treatment and post-treatment
components.  Regardless of when the acts occurred, the allegations all revolve
around the same basic premise:  that the
Hospital put Rose at risk by allowing Dr. Fowler to treat her.  It makes no sense to conclude that some
credentialing [or hiring] claims are subject to the MLIIA and others are not,
depending on what point in time the credentialing decision occurred.

 

156
S.W.3d at 545.  (Emphasis added).  Accordingly, we cannot say that the passage
of time or Espinoza's prior employment, as a matter of law, absolves THI of any
breach of its duty to hire and retain competent nurses.

            Regarding
causation, here, Espinoza's conduct, as it pertains to Jacob, is identical to
the wrongful conduct he committed in Colorado, i.e., administering Ativan without required approvals.  The evidence supports the conclusion that,
although Long was aware of Espinoza's stipulated probation order, she never
reported that fact to the Texas nursing authorities, knowing it would affect
his employability as a nurse licensed to practice in Texas.   The evidence of record further indicates
that not only did Long not take precautions to prevent similar conduct from
occurring again, she promoted Espinoza to a position of authority with
sufficient power to make it relatively easy for him to engage in the same
errant behavior.    

            The
jury's findings that THI was negligent in hiring Espinoza and that negligence
caused Jacob's injury are not so against the great weight and preponderance of
the evidence as to be clearly wrong or manifestly unjust.  Accordingly, we cannot say that the evidence
was either legally or factually insufficient to support the jury's verdict
under Appellees’ negligent credentialing/hiring
theory of recovery.

                                    2.         Medical
Malpractice - Negligence

 

            THI next contends the evidence is factually insufficient to support the
jury's finding that THI's negligence, through its employees, in administering
two doses of Ativan to Jacob proximately caused his death.[51]  In support, THI asserts the credentials of its
expert, Dr. Hail, are superior to Dr. Haines's credentials and the opinions of
its experts, Dr. Hail and Dr. Rice, are entitled to more weight than Dr.
Haines's opinions.  

            While
proximate cause in a medical malpractice case must be based upon reasonable
medical probability; Park Place Hosp. v.
Estate of Milo, 909 S.W.2d 508, 511 (Tex. 1995), "[t]he quantum of
proof required is simply 'that it is more likely than not that the ultimate
harm or condition resulted from such negligence."  Kramer
v. Lewisville Mem. Hosp., 858 S.W.2d 397, 400 (Tex. 1993).  A plaintiff is not required to exclude every
other reasonable hypothesis;  Marvelli v. Alston, 100 S.W.3d 460, 470
(Tex.App.--Fort Worth 2003, pet. denied), and more than one proximate cause may
exist.  Lee
Lewis Constr., Inc. v. Harrison, 70 S.W.3d 778, 784 (Tex.
2001) (question is whether the wrongful act "was 'a' proximate cause, not ‘the’
proximate cause" of decedent's death). 
 

            To
satisfy the causal element of proximate cause, the wrongful act need only be a
substantial factor[52] in bringing about the harm.  Southwest
Key Program, Inc. v. Gil-Perez, 81 S.W.3d 269, 274 (Tex. 2002); Sisters of St. Joseph of Texas, Inc. v.
Cheek, 61 S.W.3d 32, 35 (Tex.App.--Amarillo 2001, pet. denied).  Further, whether a
particular act of negligence is a cause-in-fact of an injury is a particularly
apt question for jury determination.  Farley v. MM Cattle Co., 529 S.W.2d 751,
756 (Tex. 1975).  See Tex. Dept. of Transp. v. Pate, 170 S.W.3d 840, 848 (Tex.App.--Texarkana
2005, pet. denied).  

            Any
objection to the qualifications or methodology of Appellees' expert witness,
Dr. Haines, was waived at trial because THI made no objection to his testimony.  To preserve a complaint that scientific
evidence is unreliable and thus, no evidence, a party must object to the
evidence before trial or when the evidence is offered.  See
Volkswagon of America, Inc. v. Ramirez, 159 S.W.3d 897, 903 (Tex. 2004); Kerr-McGee Corp. v. Helton, 133 S.W.3d
245, 252 (Tex. 2004).  Further, whether
an expert's testimony is credible or not is best left to the jury.  See Pascouet,
 61 S.W.3d at 615-16.

            Dr.
Haines practiced family medicine for twenty-three years.  His practice is comprised of approximately
thirty percent of patients over sixty-five years of age.  He has cared for patients taking benzodiazepines,
the same class of drug as Ativan.  He testified
that common side effects from Ativan range from sedation and respiratory
depression to agitation and confusion.  He
also testified Ativan's manufacturer listed respiratory depression as the top
adverse reaction to the drug[53] and an overdose of Ativan
can cause respiratory depression to the extent a person's heart stops.    

            Although
Jacob did not undergo a specific medical test to determine whether he had an
allergy to Ativan, Dr. Haines testified Jacob's medical records indicated that
he "reacted badly" to Ativan prior to being admitted to Southwest
Hospital, i.e., quit breathing after receiving Versed, another benzodiazepine,
in preparation for a recent MRI at Covenant and experienced agitation/confusion
when medicated by Ativan as illustrated by his physicians' orders labeling
Ativan as an allergy for Jacob.  

            Dr.
Haines opined that, after Jacob received the second dose of Ativan in the early
morning hours of December 19, he was overdosed. 
His breathing became increasingly more shallow until there was
insufficient oxygen to support the functions of his heart or brain causing his
heart to go into arrhythmia until he suffered a cardiac arrest and finally quit
breathing altogether due to respiratory depression.

            Dr.
Hail disagreed.  She testified that Jacob
died of a heart attack based upon a blood test taken nearly an hour after Jacob
was found unresponsive and was transferred to Covenant.  She also based her opinion on telemetry
strips recorded at Covenant on December 12 (before Jacob was transferred to
Southwest Hospital) and on December 19 (after Jacob was returned from Southwest
Hospital.)  She opined that, based upon
her experience in the emergency room, Ativan does not cause respiratory
depression and two milligrams of Ativan was not an overdose.  

            Contrary
to Dr. Hail's opinion, however, hospital documentation showed Jacob's heart
condition was stable prior to receiving the two doses of Ativan.  When Jacob was transferred from Covenant to
Southwest Hospital on December 12, his discharge summary noted that he was
"released in stable condition, neurologically intact [with] a stable
cardiac evaluation."  No medical
devices were utilized to monitor Jacob's cardiac condition while he was at
Southwest Hospital.  

            Prior
to receiving Ativan on December 18, Jacob's Progress Note indicated he was
negative for shortness of breath, negative for chest pain, and negative for nausea
or vomiting.  Although the December 18
Progress Note indicated he was experiencing atrial fibrillation, the Progress Note
stated he was "on Coumadin as well as Lorenex, continue these and recheck 12/20/04." (Emphasis added).  Further, only hours before receiving either
dose of Ativan on December 18 and 19, Nurse Graham checked Jacob's breathing
status and vital signs.  She noted his
oxygen saturations and respiratory rate and "didn't see anything
abnormal."  

            Approximately
six hours after receiving what Dr. Haines termed an overdose of Ativan, Jacob was discovered with no vital signs and
unresponsive.  On subsequent examination
by Dr. Wheeler at Covenant, he noted Jacob was "currently obtunded,
probably secondary to [an] Ativan injection."  Dr. Wheeler noted that "allergies noted
on [Southwest Hospital's] history show morphine and Ativan," and that
Jacob had "recently been given Ativan 2 mg IV push q. 4 hours p.r.n., he
has received two doses of this over the last 24 hour period."  Based upon Jacob's medical records in
addition to his experience, Dr. Haines opined that, prior to receiving Ativan, Jacob's
medical records did not show he was experiencing irregular heart rhythms that
were dangerous or symptoms associated with a heart attack such as chest pains,
nausea, or shortness of breath prior to his coding.  

            Dr.
Hail also testified that, if Jacob was having an allergic reaction to Ativan,
the manifestation of his symptoms would have occurred within minutes of taking
the Ativan rather than hours later.  Dr.
Haines, on the other hand, testified that Jacob did not go into anaphylactic
shock after receiving the Ativan which, in his opinion, could occur within an
hour or two of taking the Ativan, but instead suffered from an adverse reaction
or side effect due to his sensitivity to Ativan.  He testified the effect of the multiple doses
of Ativan on Jacob was cumulative, i.e., his respiratory distress or adverse
reaction slowly increased as the medication was digested and absorbed into the
bloodstream until he was unable to breathe. 


            Dr.
Haines testified that Jacob arrested four hours after the MRI at Covenant on December
3 when, prior to the MRI, he had received Versed, a member of the benzodiazepine
family of drugs and faster acting than Ativan. 
In his opinion, Jacob suffered a similar adverse reaction at Southwest
Hospital where he was given multiple two milligram doses of Ativan, one at 4:00
p.m. on December 18 and another at 1:30 a.m. on December 19, and arrested approximately
five hours and forty-five minutes after the second dose of Ativan at 7:15 a.m.   

            Dr.
Rice opined that Jacob died of his underlying medical conditions.  He pointed to the same blood test and
telemetry readings relied on by Dr. Hail. 
Although he testified there was no scientific evidence that Ativan
causes respiratory depression, he conceded that respiratory failure is a side
effect of Ativan reported by its manufacturer. 
He also testified that complications from taking a drug of the benzodiazepine
class, which includes Ativan, includes obtundation, as noted by Dr. Wheeler on
Jacob's admission on December 19, i.e.,
"a level of consciousness before a coma."  

            Dr.
Rice testified that he did not want Jacob to receive Ativan because  (1)  it was well known in literature that Ativan in
geriatric patients or severely ill patients doesn't calm them down like it's
supposed to but may make the patient wilder and more agitated; (2) Jacob's son
had communicated that Jacob had these reactions to the drug; and (3) he didn't
want to raise Jacob's heart rate because he was concerned that the stimulus
might cause Jacob to suffer a heart attack. 
For all these reasons, Dr. Rice simply "didn't want [Jacob] to have
it."  This testimony supports Dr. Haines's
conclusion that the two doses of Ativan caused Jacob to arrest. 

            The
jury has broad latitude to infer proximate cause from the evidence and the
circumstances surrounding the injury-producing act especially when it is not
possible to produce direct proof of proximate cause or lack of proximate
cause.  J.K. & Susie Wadley
Research Inst. & Blood Bank v. Beeson, 835 S.W.2d 689, 698
(Tex.App.--Dallas 1992, writ denied) (citing Harris v. LaQuinta-Redbird Joint Venture, 522 S.W.2d 232, 236 (Tex.Civ.App.--Texarkana
1975, writ ref'd n.r.e.).  

            Here,
aided by expert testimony, the jury was free to determine that the
administration of Ativan caused Jacob to arrest because he was stable and
experiencing no symptoms of a heart attack prior to being injected with the two
doses of Ativan, yet arrested only hours after having been given the drug.  In addition, that Jacob's vital signs were
not being electronically monitored at Southwest Hospital as they had been
previously at Covenant, his vital signs were not being taken during nurse shift
visitations, and his December 18 progress note indicated it was not necessary
to check his heart medications until December 20 prior to receiving the Ativan,
were also some evidence from which the jury could reasonably infer that Jacob's
heart condition was not critical.   

            Similarly,
scientific principles provided by Dr. Haines establish a traceable chain of
causation from the condition--Jacob's arrest--back to the event--the
administration of multiple doses of Ativan. 
Having considered all the evidence, we cannot say that the jury's
finding that THI's negligence caused Jacob's injuries or death was so against
the great weight and preponderance of the evidence as to be clearly wrong or
manifestly unjust.  Accordingly, THI's
third issue is overruled.

            IV. & V.           Gross Negligence -- Sufficiency of
Evidence 

            Appellees
argued to the jury that THI was grossly negligent in causing harm to Jacob
through the administration of Ativan by either Nurse
Jahomo or Espinoza and THI ratified or approved the act.  Appellees further argued that THI was grossly
negligent, or reckless, for employing Espinoza because he was unfit.

            THI
asserts there was no clear and convincing evidence that:  (1) Espinoza or Jahomo were aware of the risk
involved in administering Ativan to Jacob and chose to proceed in conscious
indifference to his safety; (2) THI ratified Espinoza's or Jahomo's conduct, Espinoza
was unfit to care for Jacob or THI was reckless in hiring him; or (3)
Espinoza's employment proximately caused Jacob's death.

A.        Gross Negligence

            To recover exemplary damages, a plaintiff must prove by clear and
convincing evidence[54] that the plaintiff's harm
resulted from, inter alia, the
defendant's willful act or gross neglect. 
Tex. Civ. Prac. & Rem. Code Ann. § 41.003(a)(3), (b) (Vernon Supp.
2009).  Gross negligence is statutorily
defined as an act or omission:

(A) which when viewed objectively from the standpoint of the actor at the time of its
occurrence involves an extreme degree of risk, considering the probability and
magnitude of the potential harm to others; and 

 

(B) of which the actor has actual, subjective awareness of the risk
involved, but nevertheless proceeds with conscious indifference to the rights,
safety, or welfare of others. 

 

Tex. Civ. Prac. & Rem. Code
Ann. § 41.001(11) (Vernon 2008). 
(Emphasis added).

 

            Thus,
two elements comprise gross negligence. 
First, viewed objectively from the actor's standpoint, the act or
omission complained of must depart from the ordinary standard of care to such
an extent that it creates an extreme degree of risk of harming others.  Harrison,
70 S.W.3d at 784-86; Universal Servs. Co.
v. Ung, 904 S.W.2d 638, 641 (Tex. 1995).[55]  Second, the actor must have actual,
subjective awareness of the risk involved and choose to proceed in conscious
indifference to the rights, safety, or welfare of others.  See Harrison,
70 S.W.3d at 785; Ung,
904 S.W.2d at 641.  

B.        Standard of Review

                                    1.         Legal Sufficiency

            In reviewing the legal sufficiency of the evidence under a clear and
convincing standard, we look at all the evidence, in the light most favorable
to the judgment, to determine whether a reasonable trier of fact could have
formed a firm belief or conviction that its finding was true.  Garza,
164 S.W.3d at 622 (citing In re J.F.C., 96
S.W.3d 256, 266 (Tex. 2002)).  We presume
that the trier of fact resolved disputed facts in favor of its findings if a
reasonable trier of fact could do so, and disregarded any evidence a reasonable
fact finder could have disbelieved or found to have been incredible.  Id.
at 627; In the Interest of J.L., 163
S.W.3d 79, 85 (Tex. 2005).  Further,
"whenever the standard of proof at trial is elevated, [as here], the
standard of appellate review must likewise be elevated."  Southwestern
Bell Tel. Co. v. Garza, 164 S.W.3d 607, 627 (Tex. 2004).

                                                a.         Subjective Test -- Espinoza and Jahomo

            Focusing on the second, or subjective, component,[56] what separates ordinary
negligence from gross negligence is the defendant's state of mind; in other
words, the plaintiff must show the defendant knew about the peril, but his acts
or omissions demonstrate he or she did not care.  See
Diamond Shamrock Ref. Co., L.P. v. Hall, 168 S.W.3d 164, 172 (Tex. 2005); Burk Royalty Co. v. Walls, 616 S.W.2d
911, 922 (Tex. 1981).  It is this mental
attitude of reckless indifference that permits a jury to find "that the
defendant had decided to ignore the rights of others even in light of probable
and threatened injury to them."  Williams v. Steves Indus.,
Inc., 699 S.W.2d 570, 573 (Tex. 1985).  This subjective component may be established by
circumstantial evidence.  See Harrison, 70 S.W.3d at 785; Mobil Oil Corp. v. Ellender, 968 S.W.2d
917, 921 (Tex. 1998).

            As
discussed previously, the jury could reasonably infer from the evidence that
Espinoza wrote the Ativan order for Jacob without the approval of either Dr.
Rice or Nurse Graham.  Viewed from the
standpoints of Dr. Haines, Dr. Rice, Nurse Jahomo, and Espinoza, the
administration of Ativan to a patient such as Jacob without a physician's
approval could cause the patient's death. 
Dr. Rice testified that a nurse "out there writing orders without
permission puts a patient in an extreme risk, [and] if put in an extreme risk,
could suffer injury to a patient's life."  


            The
magnitude of the injury, i.e., death, and the probability of that
injury--probable enough for Jacob's doctors at Covenant to immediately, repeatedly,
and expressly enter into his chart that he had an "allergy" to Ativan
to assure that he did not receive the drug, and the myriad of precautions that
were supposed to be in place at Southwest Hospital to assure a patient does not
receive a drug to which they have an allergy (for example: placing an allergy
sticker on the patient's chart, affixing an allergy bracelet to the patient's
wrist, multiple entries in the patient's chart, computerized medicine dispensing
system with allergy warnings, twice daily entries in the Nurse Documentation
Reports)[57]--
demonstrate that the administration of Ativan to Jacob without a physician's
approval posed an extreme degree of risk. 
See Bush, 122 S.W.3d at 855.

            In
fact, Espinoza agreed that it would be extremely dangerous to administer Ativan
to a patient without a doctor's order and, after having been disciplined for an
identical incident in Colorado, realized that he would put a patient in extreme
risk of death if he were to do so again. 
Here, the jury could reasonably infer from the evidence that Espinoza
prescribed Ativan for Jacob without a physician's orders and Espinoza agreed
that, "if he wrote the order [for Ativan], he would be consciously
disregarding [Jacob's] health, safety and welfare."

            The
evidence need not show, as THI contends, that Espinoza had specific knowledge
of Jacob's allergy or sensitivity to Ativan. 
See Harrison, 70 S.W.3d at
786.  Rather, the evidence need only be
such that reasonable inferences of a conscious decision could be made.  Id.  Here, the jury's verdict is supported by
evidence that Espinoza consciously countermanded Dr. Rice's order to treat
Jacob with Zyprexia by prescribing Ativan knowing his decision could cost Jacob
his life after having checked and knowing Jacob was allergic to the drug or not
checking and not knowing, i.e., consciously indifferent to whether
Jacob was allergic or not.  

            We
find the evidence in this case is legally sufficient to support a finding that
Espinoza had actual awareness of an extreme risk involved in prescribing Ativan
for Jacob without physician permission, proceeded to act with conscious
indifference to that risk, and was, therefore, grossly negligent.[58]   

                                                b.         Corporate Liability

 

            A corporation may be liable in punitive damages for gross negligence only
if the corporation itself commits gross negligence.  Ellender,
968 S.W.2d at 921.  Further, a
corporation is grossly negligent if it authorizes or ratifies an agent's gross
negligence, or if it is directly negligent in hiring an unfit agent.  Id.  A corporation may also be grossly negligent
through the acts or inactions of a vice-principal.  Id. at 922.[59]  See Bush,
122 S.W.3d at 854; Burk, 616 S.W.2d
at 922 (corporation's "conduct can be active or passive").  

            In
determining whether acts are directly attributable to the corporate employer,
we do not restrict our review to individual elements or facts but instead
consider all the surrounding facts and circumstances to determine whether the
corporation itself is grossly negligent. 
Ellender, 968 S.W.2d at 922.  These facts and circumstances include
reasonable inferences the fact finder can draw from what the corporation did or
failed to do and the facts existing at relevant times that contributed to a
plaintiff's alleged damages.  Id. at 924.  

            From
the evidence, the fact finder could reasonably infer that Espinoza was unfit at
the time he was recruited by Long, Southwest Hospital's Director of Nursing, in
2002.[60]  Espinoza testified that, at the time THI
hired him, Long was aware his Colorado nursing license
had been suspended for administering Ativan to a patient without a doctor's approval
and, despite this knowledge, Espinoza was placed in a position at Southwest
Hospital where he supervised nurses and initiated orders for prescribed
medications.[61]    

            Further,
Espinoza testified that in early 2005 (after Jacob's death) he informed Long
that he was a drug addict and she continued to permit him to work at Southwest Hospital.  Thereafter, Espinoza's addiction was
permitted to progress until he was reported impaired--sleepy, sleep-walking,
running into walls, falling asleep at patients' bedsides.  Espinoza was misappropriating morphine and
Demerol from Southwest Hospital's computerized medicine dispensing system and
taking the medications himself without proper authorization while falsifying
the information in the system to make it appear as if patients were taking the
medication.  Finally, on November 19,
2005, he inserted an external jugular venous catheter in a patient without
proper authorization, performing a medical procedure outside the parameters of
a nursing license.  In late December
2005, Espinoza was finally discharged by Long and Southwest Hospital
administrator Graves.[62]

            From
this evidence, the jury could reasonably infer that Long
consciously disregarded the danger she was exposing patients to by permitting a
"rogue" nurse, ostensibly unrepentant up to the time of his trial testimony,[63] to supervise the care of patients
in general, and Jacob in particular.  Furthermore,
when this evidence is coupled with Long's initial decision to hire Espinoza
despite knowing of the suspension of his nursing license in Colorado, the jury
could reasonably infer that Long continued a pattern of turning a blind eye
toward Espinoza's misconduct, beginning with his original hiring and eventually
culminating in his termination in December 2005.       

            Looking
at the evidence in a light most favorable to the judgment, we cannot say that a
reasonable trier of fact could not have formed a firm belief or conviction that
THI, through Long, was directly negligent in hiring an unfit agent and/or
authorized or ratified Espinoza's gross negligence.  Accordingly, we find that the evidence was legally
sufficient to support the jury's finding of gross negligence.

                                    2.         Factual Sufficiency

            When the burden of proof is clear and convincing evidence, the
distinction between legal and factual sufficiency is very fine.  In such a factual sufficiency review we must
consider all the evidence the fact finder could reasonably have found to be
clear and convincing, and then determine whether any fact finder could
reasonably have formed a firm belief or conviction of the truth of the allegations.
 See In re J.F.C., 96 S.W.3d at 266; In the Interest of C.H., 89 S.W.3d 17,
25, 27-29 (Tex. 2002).  The difference in
applying an elevated test under the clear and convincing standard is that
"a higher quality of evidence is necessary to tip the scales."  Garza,
164 S.W.3d at 625.

            We
consider whether the disputed evidence is such that a reasonable fact finder
could have resolved it in favor of its finding. 
See In re J.F.C., 96 S.W.3d at
266.  If, in light of the entire record,
disputed evidence that a reasonable fact finder could not have resolved in
favor of the finding is so significant as to prevent a fact finder reasonably
from forming a firm belief or conviction of the truth of the finding, then the
evidence is factually insufficient.  See id.; In re S.M.L.D., 150 S.W.3d 754, 757 (Tex.App.--Amarillo 2004, no
pet.).  

            In
a single paragraph, without any citation to specific evidence in the record or
its brief, THI asserts in a conclusory fashion that the evidence is factually
insufficient to support the jury's findings either that: (1) Espinoza
understood the extreme risks involved in administering a medication to a
patient without prior approval by a physician but did not care when he
prescribed Ativan for Jacob; (2) THI ratified Espinoza's conduct; (3) Espinoza
was an unfit employee; or (4) THI was reckless for hiring Espinoza.  

            Rather
than find THI waived these issues,[64] in the interest of
justice, having reviewed the evidence cited by THI in support of its legal
insufficiency argument on the issue of gross negligence,[65] we conclude the jury could
reasonably have formed a firm belief or conviction that THI was grossly negligent
in hiring an unfit agent.  Accordingly, we
need not reach the other bases of gross negligence raised by Appellees.  See
Hogue, 271 S.W.3d at 253.  THI's
issues four and five are overruled. 

            VI.       Evidentiary Ruling - THI's Internal Investigation

            During discovery, THI asserted various statutory privileges to avoid
disclosing any information or documents regarding any in-house investigation undertaken
by Southwest Hospital into the circumstances surrounding Jacob's death.[66]     During trial, Appellees asked a number of witnesses, without
objection, whether they had been approached by Southwest Hospital regarding the
circumstances of Jacob's death or were aware of any investigation into his
death.  The witnesses answered in the
negative.[67]

            To
rebut the potential, yet improper, inference that the absence of an in-house
investigation was some sort of corporate ratification of Espinoza's conduct,
THI sought to offer the testimony of Dr. Rice concerning the matter.  When Appellees objected to Dr. Rice
testifying that an in-house investigation had been undertaken by Southwest
Hospital, on the basis that THI had asserted its investigative privilege as to
that subject during discovery, the trial court warned THI that its line of
questioning would require full and complete disclosure of the investigation and
its results.  After consulting with her
client, THI's counsel made the following statement:

So we no longer have an issue.  I
will still make my objections to the granting of [Appellees' counsel's]
objection, in that she opened the door, and, further, that the response to the
interrogatory and request for production was an objection and privilege
citation, and, the objections were never compelled or ruled on by the Court,
which would have to be an action of the Plaintiffs, and we were never asked for
a privilege log with respect to that privilege that was asserted.

 

            Because
THI chose to close the door on its own inquiry rather than open the door
further with respect to the in-house investigation, the trial court never
excluded the testimony of Dr. Rice. 
Accordingly, the trial court did not abuse its discretion by excluding
any evidence.  THI's issue six is
overruled.

            VII.      DAMAGES

            By its seventh and final issue, THI
contends the trial court's judgment should be modified to reflect application
of the various statutory provisions, found within chapters 41[68]
and 74[69]
of the Texas Civil Practices and Remedies Code,[70]
which limit the recovery of damages by a claimant.  Specifically, THI contends that: (1) § 41.008(b)
should be applied to limit Appellees' recovery of exemplary damages, (2) § 74.301(b)
should be applied to limit Appellees' recovery of noneconomic damages, and (3)
§ 74.303 should be applied to limit Appellees' overall recovery in a wrongful
death and survival action on a health care liability claim.  In response, Appellees contend that: (1) THI
waived application of §§ 41.008(b) and 74.301(b) by failing to plead those
sections as an affirmative defense, and (2) § 74.301(b) does not apply to a
wrongful death claim.  In response to
Appellees' waiver argument, THI further contends the trial court erred by
denying its motion for leave to amend its pleadings.  We will address these sub-issues in their
logical rather than numeric or sequential order.

                        A.        Applicability of § 74.303 -
Overall Damages Limitation

            While the briefs filed by both THI and
Appellees seem to indicate that the trial court did apply the § 74.303
limitation of damages provision in arriving at the dollar amount of the
judgment entered, without a detailed explanation of the trial court's calculations,
the mathematic and legal damage limiting principles applied by the trial court
in the entry of its judgment are lost on this Court.  Because this Court ultimately remands this
case to the trial court for the entry of a judgment in accordance with this
opinion, we deem it judicially appropriate to address the application of § 74.303 to the judgment to be
entered in this cause.

 

 

            Section 74.303 provides that:

(a)       In a wrongful death or survival action on
a health care liability claim where final judgment is rendered against a
physician or health care provider, the limit of civil liability for all
damages, including exemplary damages,
shall be limited to an amount not to exceed $500,000.00 for each claimant,
regardless of the number of defendant physicians or health care providers
against whom the claim is asserted or the number of separate causes of action
on which the claim is based.

(b)       When there is an increase or decrease in
the consumer price index with respect to the amount of that index on August 29,
1977, the liability limit described in Subsection (a) shall be increased or
decreased, as applicable, by a sum equal to the amount of such limit multiplied
by the percentage increase or decrease in the consumer price index, as
published by the Bureau of Labor Statistics of the United States Department of
Labor, that measures the average changes in prices of goods and services
purchased by urban wage earners and clerical workers' families and single
workers living alone (CPI-W: Seasonally adjusted U.S. City Average-All items),
between August 29, 1977, and the time at which damages subject to such limits
are awarded by final judgment or settlement.

(c)        Subsection (a) does not apply to the
amount of damages awarded on a health care liability claim for the expenses of
necessary medical, hospital, and custodial care received before judgment or
required in the future for treatment of the injury.

 

            THI contends Appellees should be
considered a single claimant for purposes of their health care liability
claim.  See Tex. Civ. Prac. & Rem. Code § 74.001(a)(2).  We find no case law that interprets the
applicability of § 74.001(a)(2) in the context of the limitation of damages in
a wrongful death and survival action on a health care liability claim where
multiple persons are claiming to have sustained damages as the result of the
bodily injury or death of a single person. 
Section 74.001(a)(2) provides that:

"Claimant"
means a person, including a decedent's estate, seeking or who has sought
recovery of damages in a health care liability claim.  All persons claiming to have sustained
damages as the result of the bodily injury or death of a single person are
considered a single claimant.

 

            A plain reading of this statute
clearly supports THI's contention. 
Therefore, for purposes of § 74.303, the estate of Jacob Perea, and his
four sons, Mario, Max, Tony, and George, i.e., Appellees
herein, are a single claimant, entitled to recover for all damages, including
exemplary damages, but not including expenses of necessary medical, hospital,
and custodial care, an amount not to exceed $500,000, as adjusted in accordance
with the provisions of §
74.303(b).  Based on the applicable consumer
price index (CPI), on June 9, 2008, the § 74.303 cap was $1,737,272.00.[71]  Because the judgment entered by the trial
court did not exceed that cap, the trial court did not err in the application
of the §
74.303 damage cap.

                        B.        Applicability
of § 74.301(b) - Noneconomic Damages Limitation 

            THI contends the trial court erred
in failing to properly apply the statutory limitation of noneconomic damages
found in §
74.301(b).  Section 74.301(b) provides:

In an action on a
health care liability claim where final judgment is rendered against a single
health care institution, the limit of civil liability for noneconomic damages
inclusive of all persons and entities for which vicarious liability theories
may apply, shall be limited to an amount not to exceed $250,000 for each
claimant.

 

            Appellees
contend the rules of statutory construction dictate that § 74.301(b) does not
apply in this case based upon the general principle that specific statutory
provisions should govern over general provisions.  Specifically, Appellees contend that the more
specific provisions of § 74.303 (which is specifically applicable to a wrongful
death or survival action) apply to the exclusion of more general provisions of
§ 74.301(b) (which is generally applicable to health care liability claims).  See
Horizon/CMS Healthcare Corp. v. Auld, 34 S.W.3d 887, 901 (Tex. 2000)
(determining that the judgment cap provisions of section 11.02 of article 4590i
prevail over the general prejudgment interest provisions of article 5069-1.05);[72]
cf. Tex. Gov't Code § 311.026 (Vernon
2005) (providing that, when construing code provisions that are irreconcilable,
"the special or local provision prevails as an exception to the general
provision").    

            When we construe a statute, our
primary goal is to ascertain and give effect to the Legislature=s
intent in enacting it.  Tex. Gov=t
Code Ann. '
312.005 (Vernon 2005); In re Canales, 52 S.W.3d 698 (Tex. 2001).  An appellate court must not interpret the
statute in a manner that renders any part of the statute meaningless or
superfluous, City of Marshall v. City of
Uncertain, 206 S.W.3d 97, 105 (Tex. 2006) (citing City of San Antonio v. City of Boerne, 111 S.W.3d 22, 29
(Tex.2003)), and where general and special provisions are both applicable,
those "provisions shall be construed, if possible, so that effect is given
to both."  Tex. Gov't Code Ann. § 311.026(a) (Vernon 2005).    

Because
a health care liability claim includes a cause of action against a health care
provider (including a health care institution) for conduct which proximately
results in the death of a claimant, arguably both statutory provisions can be
applicable to the facts of this case. 
The question is, is it possible to give effect to both provisions?

            We find no cases which directly
decide this issue.  However, because the
two statutory provisions do not conflict on their face, in order to give full
effect to the intent of the Legislature, we see no reason why one cap should
apply to the exclusion of the other cap. 
Neither the express wording of the applicable statutes, nor their
legislative history indicates that the Legislature intended anything other than
to apply both caps.  Therefore, we
conclude that both caps can be applied, and should be applied.  Because Appellees
constitute a single claimant, unless otherwise inappropriate, the trial court
should have limited THI's civil liability for noneconomic damages to $250,000.

            Appellees also contend that THI
waived the protections of §
74.301(b) by failing to affirmatively plead their application to the facts of
this case.  THI has responded to this
argument by contending that: (1) statutory damage caps are not affirmative
defenses, and/or (2) the trial court erred by not granting its motion to amend
its pleadings.  Although the Texas
Supreme Court has not directly decided whether a statutory damage caps is an
affirmative defense, it has recently held that the statutory damage caps
contained in §
41.008(b) "requires a reduction of punitive damages as a matter of law."  In re Columbia Medical Center of Las Colinas, 306 S.W.3d 246, 248 (Tex.
2010).  But see Wackenhut Corr. Corp. v. De La Rosa, 305 S.W.3d 594
(Tex.App.--Corpus Christi 2009, no pet.) (holding that the cap is an
affirmative defense which must be specifically pleaded by the defendant for it
to apply).  Although in In re Columbia Medical Center the
Supreme Court equivocates somewhat by adding the phrase "when the parties
raise the issue," 306 S.W.3d at 248, we find that the parties here have
sufficiently raised the issue before both the trial court and this Court.  Therefore, we find that § 74.301(b) requires
reduction of noneconomic damages as a matter of law and, as such, it is not an
affirmative defense.  Accordingly, we
find the trial court erred in not applying the provisions of § 74.301(b) to limit THI's
civil liability for noneconomic damages to $250,000.

C.        Applicability of § 41.008(b) - Exemplary
Damages Limitation

            THI also contends the trial court
erred by failing to apply the § 41.008(b) limitation provisions to the jury's
exemplary damages award.  Again, Appellees
counter by contending the limitation is an affirmative defense which THI waived
by failing to plead and THI has responded by contending that: (1) statutory
damage caps are not affirmative defenses, and/or (2) the trial court erred by
not granting its motion to amend its pleadings. 


            Section 41.008(b) provides:

Exemplary damages
awarded against a defendant may not exceed an amount equal to the greater of:

 

(1)(A)  two times the amount
of economic damages; plus

 

    (B)   an amount equal to any noneconomic damages found by the
jury,             not to exceed $750,000;
or

 

(2)       $200,000.

 

            Based upon the same analysis we
applied to §
74.301(b), we find the exemplary damages cap provided by § 41.008(b) is not an
affirmative defense, but must instead be applied as a matter of law.  The question then becomes, do the specific
provisions of § 74.303
control over the general provisions of § 41.008(b), or should a trial court seek to
apply both limitations?  

            Again, we find no case law answering
this question, and again we observe that, on their face, the two provisions do
not seem to conflict.  One caps exemplary
damages in all suits, while the other caps all damages in wrongful death and
survival actions.  Because the two
statutes are not irreconcilable, the statutes can be harmonized by applying the
exemplary damages cap first, and then applying the overall cap second.  Therefore, once again, in order to give full
effect to the intent of the Legislature, we believe both provisions should be
applied.  

            Having determined that § 41.008(b) does apply, because
the limit of exemplary damages is, in part, determined by the amount of
noneconomic damages, a court must further determine whether to apply the
noneconomic damages limitations of § 74.301(b) to the determination of the
exemplary damages cap provided by § 41.008(b). 
Again, we have found no cases directly determining this issue and, once
again, we find that, on their face, the two statutory provisions do not
conflict.  Accordingly, as before, we
believe both provisions should be given effect.

            Because we have found that § 41.008(b) should have been
applied, we find that the trial court erred in not applying that limiting
provision.  Furthermore, in the
application of that cap, we find the trial court should apply the noneconomic
damages limitation provisions of § 74.301(b) in determining the cap under § 41.008(b).  Accordingly, Appellees' recovery of exemplary
damages should have been limited to $285,053.94.[73]
 

 

                        D.        Correction
of Judgment

            Here,
the jury awarded Jacob's estate economic damages of $17,526.97 and noneconomic
damages of $40,000.00.  The jury also
awarded Mario, Max, Tony, and George noneconomic damages of $100,000.00 each,
for a combined total of $400,000.00.  The
jury further awarded Appellees exemplary damages of $1,250,000.00.  Furthermore, in addition to actual damages,
Appellees were entitled to recover pre-judgment interest on their actual
damages. See Tex. Fin. Code Ann. § 304.102 (Vernon 2006).[74]  Prejudgment interest is an element of recoverable
actual damages.  See Embrey v. Royal Indemn.
Co., 986 S.W.2d 729, 732
(Tex.App.--Dallas 1999), affd, 22 S.W.3d 414 (Tex. 2000).   Because
prejudgment interest is a part of Appellees' damages, it is subject to the overall
damage limit imposed by § 74.303.  Columbia Hosp. Corp. v. Moore, 92 S.W.3d
470, 475 (Tex. 2002) (interpreting subchapter K of former article 4590i); Horizons/CMS Healthcare Corp., 34 S.W.3d
at 892. 

            The trial court entered judgment in
favor of Appellees and against THI in the sum of $1,696,895.50, plus costs of
court.  To the extent the trial court
failed to properly apply the overall damages cap under § 74.303, the
noneconomic damages cap under §
74.301(b), and/or the exemplary damages cap under § 41.008(b), the trial court
erred.  THI's seventh issue is sustained.

             Because the jury apportioned the negligence
causing the "injury in question" 90% to THI and 10% to Pharmasource
Healthcare, and because Pharmasource Healthcare entered a "settlement
agreement" for the sum of $63,343.44, plus costs of court, and because
Pharmasource Healthcare has not appealed the judgment of the trial court, and
because we do not know which election THI would make under § 33.012(c) of the Texas
Civil Practices and Remedies Code, we are unable to determine the judgment that
should be entered in this cause. 
Accordingly, we remand this cause to the trial court for the rendition
of a judgment applying all applicable damages caps, the determination of
applicable credits, and the apportionment of the recovery among Appellees.  Tex. R. App. P. 43.3. 

CONCLUSION

            The trial court’s judgment is reversed and the cause is
remanded to the trial court for entry of a judgment in accordance with this
opinion.

 

                                                                                                

                                                                                    Patrick
A. Pirtle

                                                                                           Justice

 

Campbell,
J., concurring and dissenting.











[1]John T. Boyd, Chief Justice (Ret.),
Seventh Court of Appeals, sitting by assignment.  Tex. Gov=t Code Ann. ' 75.002(a)(1)
(Vernon 2005).

 





[2]The trial court applied the statutory
damage cap in § 74.303 of
the Texas Civil Practice and Remedies Code. 
See Tex. Civ. Prac. & Rem.
Code Ann. § 74.303 (Vernon 2005).  THI
asserts the trial court should have also applied the exemplary damage cap
provided by § 41.008(b)
and the noneconomic damage cap provided by § 74.301(b) of the Texas Civil Practice and Remedies
Code.  See Tex. Civ. Prac. & Rem. Code Ann. §§ 41.008(b) (Vernon Supp.
2009) & 74.301(b) (Vernon 2005).

 





[3]Michael Rice, M.D., was named as a
defendant in Appellees' Original Petition but was not named in subsequent
amended original petitions.





[4]Appellees' expert, Joe Haines, M.D.,
testified Ativan is a tranquilizer in the benzodiazepine class prescribed as a
sedative to help people sleep, for anti-anxiety, and persons with panic
attacks.  Ativan is a controlled
substance. 

 





[5]Jacob’s final diagnosis on discharge
was confusion/dementia, respiratory failure, severe coronary artery disease
with old myocardial infarction, history of congestive heart failure, chronic
renal failure/acute renal failure, mitral insufficiency of 2+, diabetes, and
pneumonia.





[6]Versed is in the same drug family as Ativan,
i.e., benzodiazepine, and is faster acting than Ativan.

 





[7]Nurse Angie Jahomo, a charge nurse at
Southwest Hospital, testified at trial that Lorazepam is the generic name for
Ativan and, as such, is recognizable by all medical professionals.

 





[8]Nurse Jahomo testified at trial that
the bracelet is the last thing a nurse looks at before giving medication to a
patient.  She also testified that “[a]
nurse would not think an allergy bracelet was a piece of jewelry, general
practice is to look at the bracelet before giving the medication.”  If a nurse gave a patient medication without
looking at the allergy bracelet, Nurse Jahomo testified the nurse would be
negligent.  She testified it would be
extremely dangerous for a nurse to give medication to a patient without a
doctor's prior approval and the nurse would lose his/her license.  If she observed such an incident, she would
report the errant nurse.  Further, if a
bracelet or chart sticker came off, she testified a nurse would be negligent
for not replacing it.  

 





[9]Nurse Jahomo testified she gave a copy
of Dr. Rice's orders to the pharmacy and notified them of Jacob’s
allergies.  She expected the pharmacy to
enter the information in the computerized medicine dispensing system.  If a patient is allergic to a particular
medication and a nurse attempts to dispense that medication through the
computerized system, the nurse will get a flashing screen indicating the
patient has an allergy to the medication. 
Although Jacob’s allergies were listed on Covenant's Medical
Administration Record (MAR), his allergies were not listed on Southwest
Hospital’s MAR.  Rather, at the top of
Southwest Hospital’s MAR, it stated: “Allergies: NKA (no known allergies).”  At trial, Nancy Dipprey, the pharmacist on
duty when Jacob was admitted, testified she believed the allergies were not
written on Nurse Jahomo's admitting orders received by the pharmacy.  She also testified she received a copy of the
admitting orders and, because they were not official records, the records had
been destroyed.  Nurse Jahomo testified
she received an incorrect MAR from the pharmacy that day but failed to notice
the error.  She accepted responsibility
for not correcting the pharmacy.  

 





[10]After speaking with Mario, Dr. Rice
wrote in Jacob’s chart that Mario had reported Jacob "had a paradoxical
reaction to Ativan, becomes agitated but does not have a true allergy.”  Dr. Rice testified that a side effect was
different than an allergy.  Nevertheless,
Dr. Rice testified he did not want Jacob to receive Ativan.  He testified that, when the issue came up, he
informed the nurse that Jacob should have no medication from the benezodiazepine class. 
Dr. Rice also testified it is well described in literature that Ativan
in geriatric patients or a severely ill patient does not calm them down like it
is supposed to but actually causes them to become wilder and more
agitated.  Because of what Jacob's son
said, the possibility of a C2 fracture, Jacob had a bad heart and underlying
disorders, Dr. Rice did not want any stimulus that might cause him to have a
heart attack or complicate his condition. 
Accordingly, Dr. Rice prescribed Zyprexia, a sedative or antipsychotic
drug of a different drug class than benezodiazepine
that is used to calm persons who have sensitivity to Ativan. 

 





[11]Dr. Joe Haines, plaintiff's expert,
testified that, once Dr. Rice had noted Jacob was allergic to morphine and
Ativan, a second order by Dr. Rice or another doctor would be necessary to countermand
Dr. Rice's initial order to permit Jacob to receive Ativan.

 





[12]An NDR is patient specific and
routinely filled out by the nurse caring for the patient during a particular
shift.  The first entry on the NDR is
typically an acknowledgment by the nurse shift that he or she received and
reviewed the NDR written by the nurse on the prior shift.   

 





[13]A Nurse Practitioner’s license permits
the nurse to write prescriptions.

 





[14]Jacob’s Progress Note for December 18
indicated he was on Zyprexia for agitation and was negative for shortness of
breath, negative chest, negative nausea, or vomiting.  The Note’s Assessment and Plan stated the
following:  "1.  Status post C-spine fracture, continue
Minerva brace and follow-up with Dr. Willis; 2. Fall, diligent fall
precautions; 3. End stage renal disease – continue prn dosing as well and monitor;
5. Atrial fibrilliation – patient on Coumadin as well as Lorenex, continue
these and recheck on 12/20/04."

 





[15]The NDR from the prior shift ending at
7:00 a.m. indicated Jacob had allergies to Ativan and morphine.  Although Nurse Rosales's NDR indicates she
received the prior NDR showing Jacob had allergies to Ativan and morphine, her
subsequent NDR given to Nurse Joiner at the 7:00 p.m. shift indicates
"NKA" or no known allergies.      


 





[16]Dr. Rice and Graham both denied giving
any order to Espinoza approving administration of Ativan to Jacob.  

  





[17]A CARDEX is a short form listing the
relevant medical information for a patient including an update from the prior
nurse.  Nurse Rosales testified Jacob's
CARDEX should have included a summary of his allergies, condition, procedures,
etc.  Nurse Rosales could not remember
Jacob's CARDEX and it was not entered into evidence.  

 





[18]Nurses Rosales's and Joiner's NDR both
indicated Jacob had no known allergies.  

 





[19]Nurse Joiner testified Southwest
Hospital's bands were red and white.  He
also testified he did not attend to the band because he thought it was a piece
of jewelry or religious artifact.

 





[20]Mario testified he observed the
allergy band he first observed at Covenant, and later at Southwest Hospital, on
his father's wrist when he arrived at Covenant's emergency room where a nurse
cut the band off for him.  The band was
admitted at trial and indicated Jacob had allergies to morphine and
Ativan.  Dr. Rice testified he discovered
Jacob had received Ativan and was angry because his written order had been
ignored.  He subsequently took the matter
up with Southwest Hospital Administrator, Deanna Graves, and she agreed to do
something about their systems. 

 





[21]Dr. Hail, THI’s expert, defined
“obtunded” as “a word that can mean confused or unconscious.  It can be a spectrum, altered mental status .
. . in this case, with it being after [Jacob] coded at Southwest [Hospital],
[Dr. Wheeler] is referring to the brain death or getting close to that.”  Dr. Hail further testified that, by the
phrase “secondary to Ativan injection,” Dr. Wheeler “is hypothesizing that the
cause of [Jacob’s] obtundation is from the Ativan. . . .”





[22]Dr. Haines explained that a drug such
as Ativan, which normally sedates a patient, might also cause agitation and
confusion in some people, represents what is termed a “paradoxical reaction,
i.e., “where you get the opposite of
what you are trying to achieve.”  

 





[23]Dr. Hail testified “[t]elemetry is
just essentially an EKG over a period of time.” 
On cross-examination, however, Dr. Hail conceded that a hospital usually
pulls only those strips that are abnormal and agreed with counsel that she had
left many strips behind because an entire day’s reading would comprise
thousands of such strips.  She also
conceded that doctors at Covenant had also looked at the strips and no one
diagnosed Jacob as having a heart attack. 
Jacob was not connected to any monitoring devices while at Southwest
Hospital. 

 





[24]Dr. Hail testified a troponin blood test is specific to having a heart
attack.   

 





[25]"'Perhaps' and 'possibly'
indicate conjecture, speculation, or mere possibility rather than qualified
opinions based on reasonable medical probability."  Columbia Medical Center of Las Colinas, Inc. v. Hogue, 271 S.W.3d
238, 247 (Tex. 2008).

 





[26]On cross-examination, Dr. Haines
testified that the patient who received the eight milligram dose of Ativan was
a sixteen year old who was suffering from a bad LSD trip.

 





[27]End stage renal disease, congestive
heart failure, stroke, and diabetes.

 





[28]Dr. Rice testified an elevated BMP is
a “marker for high probability or risk of death.  It is also a marker for congestive heart
failure or ventricular strain.”  He
further testified that, in patients with underlying cardiac disease coupled
with end stage renal disease or diabetes, BMP levels of the magnitude of
Jacob’s are a very high indicator for likely death, “a marker for mortality.”





[29]Espinoza's testimony subsequently
equivocated on the timing of this disclosure to Long.  After testifying Long
was aware of his drug addiction in early 2005, he later testified she was not
aware until September 2005.





[30]As to Southwest Hospital,
"negligence" and "proximate cause" were defined as follows:

 

"Negligence" when used with
respect to the conduct of Southwest Regional Specialty Hospital means failure
to use ordinary care, that is, failing to do that which a hospital of ordinary
prudence would have done under the same or similar circumstances or doing that
which a hospital of ordinary prudence would not have done under the same or
similar circumstances.

 

"Proximate Cause" when used
with respect to the conduct of Southwest Regional Specialty Hospital means that
cause which, in natural and continuous sequence, produces an event, and without
which cause such event would not have occurred. 
In order to be a proximate cause, the act or omission complained of must
be such that a hospital using ordinary care would have foreseen the event, or
some similar event, might reasonably result therefrom.  There may be more than one proximate cause of
an event.

 

STATE BAR OF TEX., TEXAS PATTERN JURY
CHARGES--GENERAL NEGLIGENCE; INTENTIONAL PERSONAL TORTS, PJC 2.4 (2008).

 





[31]The jury found Pharmasource
Healthcare, Inc. and Omnicare Inc., d/b/a Pharmasource Healthcare, Inc. (Pharmasource), ten percent negligent and Southwest Hospital
ninety percent negligent.  

 





[32]The jury awarded the estate the sum of
$40,000 for pain and mental anguish, $107,228.15 for medical expenses and $12,490.25
for funeral and burial expenses.  In the
entry of its judgment, the trial court reduced the recovery of medical expenses
to $5,036.72 pursuant to the "paid or incurred" limitation contained
in § 41.0105.  

 





[33]The judgment also ordered that
Appellees recover the sum of $63,343.44 from Pharmasource.  Pharmasource did not appeal.  

 





[34]In the Fifth Amended Original
Petition, Jacob's estate sought damages for personal injury including physical
pain and suffering, physical impairment, mental anguish, reasonable and
necessary medical expenses, and funeral and burial expenses.

 





[35]In the Fifth Amended Original
Petition, Jacob's sons sought damages for the loss of Jacob's love, counsel,
companionship, and care, i.e., mental anguish, emotional pain,
torment, and mental suffering.

 





[36]In Texas, a cause of action for
negligence requires three elements:  (1)
a legal duty owed by one person to another; (2) breach of that duty; and (3)
damages proximately caused by the breach. 
D. Houston, Inc. v. Love, 92
S.W.3d 450, 454 (Tex. 2002). 

 





[37]Rule 277 of the Texas Rules of Civil
Procedure provides that "the court shall, whenever feasible, submit the
cause upon broad-form questions." 
Tex. R. Civ. P. 277.  In Texas Dep't of Human Services v. E.B.,
802 S.W.2d 647 (Tex. 1990), the Texas Supreme Court interpreted the phrase
"whenever feasible" as mandating broad-form submission "in any
and every instance in which it is capable of being accomplished."  Id. at 649. 

 





[38]Southwest Hospital's objection to the
charge at trial was that, if the jury believed the hospital caused an injury to
Jacob but not his death, "the wrongful death beneficiaries would not be
entitled to recover."  Question 3(c)
asked what sum of money would compensate Jacob for damages he would have for
funeral and burial expenses, while Questions 4 through 7 asked what sum of
money "would fairly and reasonably compensate [Jacob's sons] for [their]
damages, if any, resulting from the death
of Jacob Perea."  (Emphasis
added).  Thus, although the jury may have
found Southwest Hospital negligently caused Jacob's injury, these damage
instructions reminded the jury that they were limited to damages resulting from
Jacob's death.  

 





[39]During THI's
examination, Espinoza testified he "[could] not think of a time he ever
wrote an order for a controlled substance such as Ativan when he had not first
gotten the order from a doctor."  
Appellees sought to impeach this testimony with the stipulated order
wherein he had been disciplined by the Colorado Board of Nursing in 1996 for
administering Ativan to a patient without a physician's order.  

 





[40]See
also Allstate Prop. & Cas. Ins. Co. v. Guiterrez, 281 S.W.3d 535, 539 (Tex.App.--El
Paso 2008, no pet.); (a trial amendment may be prejudicial on its face,
"but this does not make it prejudicial as a matter of law"); American Title Company of Houston v. Bomac
Mortgage Holdings, L.P., 196 S.W.3d 903, 909 (Tex.App.--Dallas 2006, no
pet.) (decision to permit or deny trial amendment
rests in sound discretion of trial court if amendment asserts new cause of
action or defense); Deutsch v. Hoover,
Bax & Slovacek, L.L.P., 97 S.W.3d 179, 186 (Tex.App.--Houston [14th
Dist.] 2002, no pet.) ("An amended pleading asserting a new defense is not
prejudicial as a matter of law; the amendment must be evaluated in the context
of the entire case.").

 





[41]THI
contends surprise was asserted when its counsel attempted to exclude the
testimony of Deanna Graves, Southwest Hospital Administrator, on the issue of
negligent credentialing because she was not on Appellees' witness list.  THI's objection to Graves testifying was made
pursuant to Rule 193.6 of the Texas Rules of Civil Procedure, not Rule 66.  Further, the trial court had already held a
hearing on Appellees' motion to amend and granted the Rule 66 motion prior to
THI's Rule 193.6 objection.  Moreover,
Appellees' attorney informed THI four days prior to calling Graves to testify
that she intended to call Graves to discuss Espinoza's employment file, and
Graves was listed as a potential witness on Pharmasource's witness list for
trial.  

 

 





[42]When both
legal and factual sufficiency challenges are raised on appeal, the reviewing
court must first examine the legal sufficiency of the evidence.  See
Glover v. Tex. Gen. Indemnity Co., 619 S.W.2d 400, 401
(Tex. 1981).  

 





[43]"[T]he test
for legal sufficiency should be the same for summary judgment, directed
verdicts, judgments notwithstanding the verdict and appellate no-evidence
review."  168
S.W.3d at 823.

 





[44]Evidence
does not exceed a scintilla if it is "so weak as to do no more than create
a mere surmise or suspicion" that the fact exists.  Ford Motor Co. v. Ridgway, 135 S.W.3d 598, 601 (Tex. 2004).  





[45]A "health care liability
claim" is as follows:

 

[A] cause of action against a health
care provider or physician for treatment, lack of treatment, or other claimed
departure from accepted standards of medical care, or health care, or safety or
professional or administrative services directly related to health care, which
proximately results in injury or death of a claimant, whether the claimant's
claim or cause of action sounds in tort or contract.  

 

Tex.
Civ. Prac. & Rem. Code Ann. § 74.001(13) (Vernon 2005).

 





[46]"The competent selection and
review of medical staff is precisely the type of professional service a
hospital is licensed and expected to provide, for it is in the business of
providing medical care to patients and protecting them from unreasonable risk
of harm while receiving medical treatment . . . [T]he competent performance of
this responsibility is 'inextricably interwoven' with delivering competent
quality medical care to hospital patients. 
Diversicare, 185 S.W.3d at 853
(quoting Bell v. Sharp Cabrillo Hosp.,
212 Cal.App.3d 1034, 260 Cal. Rptr. 886, 896 (Cal.Ct.App. 1989)).  "It follows that proper staffing for the
care and protection of patients is related to and part of the rendition of
health care."  Holguin v. Laredo Regional Medical Center,
256 S.W.3d 349, 356 (Tex.App.--San Antonio 2008, no pet.).  "Without safe, reliable staffing, health
care would obviously be compromised because 'training and staffing policies and
supervision and protection' of patients ‘are integral components of . . .
health care services.'"  Id. (quoting Diversicare, 185 S.W.3d at 850) (collected cases cited therein)).

 





[47]Southwest Hospital does not assert that it lacked a duty to hire
and supervise competent nurses.  

 





[48]An employer owes a duty to its other
employees and to the general public to ascertain the qualifications and
competence of the employees it hires, especially when the employees are engaged
in occupations that require skill or experience and that could be hazardous to
the safety of others.  JTM Materials, Inc., 78 S.W.3d at 50
(citing Wise v. Complete Staffing Servs.,
Inc., 56 S.W.3d 900, 902 (Tex.App.--Texarkana 2001, no pet.)).  See LaBella,
942 S.W.2d at 137 ("Texas courts have long recognized a master's duty to
make inquiry into the competence and qualifications of those he considers for
employment."). 

 





[49]Espinoza testified he did not disclose
the Colorado Board of Nursing's disciplinary proceedings or their order to
Texas authorities.  Under the Texas
Nursing Practice Act, a person is subject to "denial of license or to
disciplinary action . . . for . . . revocation, suspension, or denial of . . .
the person's license or privilege to practice nursing in another
jurisdiction.  Tex. Occ. Code Ann. §
301.452(b)(8) (Vernon 2004).

 





[50]Espinosa testified that he went to
work for Highland in May of 1997. 
Although the Colorado stipulated probation order was not issued until
September 1997, his testimony was unclear as to when proceedings were initiated
before the State Board of Nursing in Colorado.

 





[51]THI does not assert that Southwest
Hospital's nurses owed no duty to properly care for and treat Jacob or that
they did not breach their duty of care. 

 





[52]"The word 'substantial' is used
to denote the fact that the defendant's conduct has such an effect in producing
the harm as to lead reasonable men to regard it as a cause."  Givens
v. M&S Imaging Partners, L.P., 200 S.W.3d 735, 738-39 (Tex.App.--Texarkana
2006, no pet.) (quoting RESTATEMENT (SECOND) OF TORTS § 431 cmt. a
(1965)).  See Healthcare Centers of Texas, Inc. v. Rigby, 97 S.W.3d 610, 625
(Tex.App.--Houston [14th Dist.] 2002, pet. denied).

 





[53]Nurse Joiner testified Ativan is a
Central Nervous System suppressant and the number one side effect of Ativan is
decreasing a patient's ability to breathe. 






[54]Evidence is "clear and
convincing" if it "will produce in the mind of the trier of fact a
firm belief or conviction as to the truth of the allegations sought to be
established."  Tex.
Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon
2008).  "[E]vidence that does more than raise surmise or suspicion will not
suffice unless it is capable of producing a firm belief or conviction that the
allegation is true."  Garza, 164 S.W.3d at
621.

 





[55]"Extreme
risk" is not "a remote possibility of injury or even a high
probability of minor harm, but rather the likelihood of serious injury to the
plaintiff."  Transp. Ins. Co. v. Moriel, 879 S.W.2d 10, 22 (Tex. 1994) (quoting Wal-Mart Stores, Inc. v. Alexander, 868
S.W.2d 322, 327 (Tex. 1993)).  





[56]THI does not challenge on appeal
whether Appellees met the objective component.





[57]Dr. Haines testified that Jacob's
doctors entered into the medical records and past medical history multiple
times that he was allergic to Ativan--"[h]is doctors did not want him to
have it.  I mean, it's very
simple."  He further testified that,
when a patient reacts to drugs, "you do
everything you can do to make sure the patient doesn't get the drug, because
that is the worse [sic] thing that can happen. 
You put somebody in the hospital, to take care of another problem, and
then you give them something that kills them. 
That is the worse [sic] thing you can do, you know." 

 





[58]When judgment rests on multiple
theories of recovery, we need not address all causes of action if any one
theory is valid.  EMC Mortgage Corporation v. Jones, 252
S.W.3d 857, 870-71 (Tex.App.--Dallas 2008, no pet.) (citing
Checker Bag Co. v. Washington, 27
S.W.3d 625, 634 (Tex.App.--Waco 2000, pet. denied)).  As such, we need not decide whether there was
sufficient evidence to support a finding that any act or omission by Nurse
Jahomo was grossly negligent.

 





[59]Such
vice-principals include corporate officers; those who have authority to employ,
direct, and discharge other employees; those engaged in performing the
corporation's nondelegable or absolute duties, and those responsible for the
management of the whole or a department or a division of the business. Ellender, 968 S.W.2d at 921 (citing Hammerly Oaks, Inc. v. Edwards, 958
S.W.2d 387, 391 (Tex. 1997)). 

 





[60]THI does not challenge on appeal
whether Long is a vice-principal of Southwest Hospital.

 





[61]Espinoza was the charge, or
supervising, nurse over Nurses Rosales and Joiner while they cared for
Jacob.  As a charge nurse, Espinoza
supervised all floor nurses and directed them on how to best manage and care
for patients.  He assisted floor nurses
when they had questions, difficulties, or trouble with patients.  If he observed a problem on the floor, he was
responsible for bringing the problem to the attention of hospital
administrators.  

 





[62]Ultimately, in May 2007, Espinoza
surrendered his Texas nursing license per an agreed order in a proceeding
before the Texas Board of Nursing Examiners premised on these same infractions.


 





[63]Despite the stipulated order in
Colorado and subsequent agreed order in Texas with the state boards of nursing,
Espinoza's testimony at trial indicated he yet believed he had done nothing
wrong and should not have been disciplined in either case.

 





[64]Generally, because THI failed to
specifically cite any record evidence in support of these general contentions,
these arguments were insufficiently briefed, and therefore, waived.  Tex. R. App. P. 38.1(h).   

 





[65]In support
of its legal sufficiency argument, THI argued: (1) Espinoza testified he
received an order prescribing Ativan from Nurse Graham; (2) Espinoza had no
specific knowledge Jacob was sensitive or had an allergy to Ativan; (3) Nurse
Jahomo had no explanation for why Jacob was not wearing an allergy bracelet on
December 18; (4) Nurse Jahomo was unaware that the pharmacy did not have the
allergy information on Jacob that was forwarded by Covenant when Jacob was
originally transferred to Southwest Hospital; and (5) Nurse Jahomo testified
she made a mistake by not reviewing Jacob's MAR and correcting the MAR to show
that he, in fact, had an allergy to Ativan. 


 





[66]By interrogatory and request for
production of documents, Appellees sought information related to any in-house
investigation undertaken by THI.  THI
asserted privilege and refused to answer the interrogatory or produce any
documents.  When asked by Appellees'
counsel prior to trial, THI's counsel represented she would not be offering any
evidence of an in-house investigation into Jacob's death by Southwest Hospital.

 





[67]Pharmacist Dipprey, Nurse Rosales,
Nurse Graham, and Espinoza testified that no one at Southwest Hospital
questioned them regarding the circumstances of Jacob's death or the order for
Ativan and they were unaware of any investigation into Jacob's death.  Dr. Haines testified he saw no evidence of an
investigation in the records he reviewed and believed the director of nursing
at Southwest Hospital should have done some investigation to assure a similar
incident did not happen again.  THI did
not object to this testimony. 





[68]Tex. Civ. Prac. & Rem. Code
Ann. § 41.008(b) (Vernon Supp. 2009).

 





[69]Tex. Civ. Prac. & Rem. Code
Ann. §§ 74.301(b) & 74.303 (Vernon 2005).

 





[70]For convenience, throughout the
remainder of this opinion, 
references to simply "section __" and/or "§
__" are references to the Texas Civil Practice and Remedies Code. 

 





[71]According to the U.S. Department of
Labor, Bureau of Labor Statistics, Table 5. Consumer Price Index for Urban Wage
Earners and Clerical Workers (CPI-W): Seasonally Adjusted U.S. City Average-All
Items, the CPI for June 2008 was 213.337. 
See http://www.stats.bls.gov/PDQ/servlet/SurveyOutputServlet (last visited May 12, 2010).  This represents a 247.4544% increase over the
CPI for August 1977 (CPI = 61.40). 
Therefore, on June 9, 2008, the § 74.303 cap was $1,737,272.00
(($500,000 x 2.474544) + $500,000).

 





[72]Former article 4590i, § 11.02(a) provided
that "[i]n an action on a health care liability
claim where final judgment is rendered against a physician or health care
provider, the limit of civil liability for damages of the physician or health
care provider shall be limited to an amount not to exceed $500,000."  

 





[73]Appellees' economic damages equaled $17,526.97
($12,490.25 + $5,036.72 = $17,526.97).  See fn. 32, supra.  Two times economic
damages, plus noneconomic damages, as limited by § 74.301(b), up to $750,000,
equals $285,053.94. ((2 x $17,526.97) + $250,000 = $285,053.94).

 





[74]Prejudgment interest may not be assessed
or recovered on an award of exemplary damages. 
See Tex. Civ. P. & Rem.
Code § 41.007 (Vernon
2008).